**Robbin HOWARD, Appellant,**

v.

**DES MOINES REGISTER AND TRIBUNE COMPANY, Dr. Roy C. Sloan and Margaret Engel, Appellees.**

**62059.**

Supreme Court of Iowa.

Sept. 19, 1979.

McCORMICK, Justice.

The trial court entered summary judgment for defendant Des Moines Register and Tribune Company and its reporter Margaret Engel in this action for invasion of privacy. The action was brought by plaintiff Robbin Howard in an effort to obtain redress from these defendants and defendant Dr. Roy C. Sloan for a disclosure in a 1976 newspaper story that she had been involuntarily sterilized while a resident of the Jasper County Home in 1971. This appeal does not involve the claim against Dr. Sloan. The controlling questions are whether recovery from the newspaper and its reporter is precluded either because the information was already public or because the trier of fact would be unable to find it was not newsworthy. We affirm the trial court.

In *Bremmer v. Journal-Tribune Publishing Co.*, 247 Iowa 817, 76 N.W.2d 762 (1956), this court held that a common-law action for invasion of privacy may be maintained in Iowa. We have adopted the principles of the tort delineated in *Restatement (Second) of Torts* § 652 (1977). *See Winegard v. Larsen*, 260 N.W.2d 816, 822 (Iowa 1977).

Plaintiff based this action on the theory that defendants invaded her privacy by giving unreasonable publicity to her private life. This theory of invasion of privacy is defined in *Restatement* section 652D:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
> (a) would be highly offensive to a reasonable person, and
>
> (b) is not of legitimate concern to the public.

In moving for summary judgment, defendants relied on several grounds. The trial court rejected public record and waiver of privacy grounds but sustained the motion on the newsworthiness ground. As they are entitled to do, defendants seek affirm-

Oscar E. Jones, Des Moines, for appellant.

Paul E. Kritzer and Glenn L. Smith, Des Moines, for appellees Des Moines Register and Tribune Co. and Margaret Engel.

ance on grounds rejected by the trial court as well as on the ground which was accepted. *See State ex rel. Miller v. National Farmers Organization,* 287 N.W.2d 905, 906 (Iowa 1979); *In re Estate of Poulos,* 229 N.W.2d 721, 724–25 (Iowa 1975). In deciding the appeal, we find it necessary to consider only the public record and newsworthiness grounds.

We first summarize the summary judgment record, which includes pleadings, depositions and affidavits.

In her petition, plaintiff alleged she was formerly known as Robin Woody; in 1970, while a minor, she was confined in the Jasper County Home; she was at that time sterilized against her wishes; after her release from the home she led a quiet and respectable life and made friends and acquaintances who were not aware of her surgery; defendant Roy C. Sloan told defendant Margaret Engel about the 1970 sterilization in late 1975 or early 1976; on February 15, 1976, defendant Des Moines Register and Tribune Company published an article in the Des Moines Sunday Register written by Engel which revealed the 1970 sterilization; and this article subjected her to public contempt, ridicule and "inquisitive notice," humiliated her and caused her mental pain and anguish. In separate divisions she asked actual damages of $500,000 and punitive damages of $500,000 from each defendant.

A copy of the newspaper article accompanied the petition. Under a headline which read "Scalding deaths at Jasper Home revealed," and over Margaret Engel's byline, the article was as follows:

NEWTON, IA.—The Jasper County Home, under fire from the state Health Department for poor care and lax administration, has a history marred by deaths from scalding baths, sterilizations of women who are not mentally disabled, and shipments of prescription drugs that apparently were illegal.

The administrator of the home for 22 years, Riva Ripper, quit in the wake of a Jan. 30 notice from the Health Department that the home's custodial and nursing licenses will be revoked. The revocation notices accused the home of a long list of health, safety and management violations.

The home's nursing director, Ruth Broderson, also resigned. Ripper's husband, Clarence, who ran the adjoining county farm, died of a heart attack Feb. 1.

Health officials say the home has had continual problems over the years. In checking county records, The Register has learned that two of the home's residents died as a result of scalding baths.

A grand jury investigation was held in 1969 in the death of Sheryl Anthony, 18, who died that May of thermal burns. No indictments were returned and the grand jury's minutes remain secret.

On Sept. 9, 1974, there was a second death from burns at the home.

Richard Shivers, 63, died 13 days after suffering from second- and third-degree burns on his back. His aunt, Kathryn Gustafson of Newton, says Shivers told her before he died that he was bathing himself and mistakenly turned on the wrong faucet.

Shivers, who was classed as a chronic schizophrenic, probably got "over nervous and slipped in the tub and could not get out," she said, adding she does not believe anyone was negligent.

Dr. John Ferguson, who visits weekly at the home, said Shivers was able to bathe himself and that he was "momentarily left" by an aide when the accident occurred.

The state Health Department did not know of the deaths until recently, despite a rule requiring nursing homes to submit reports on such accidents. Jonn Wild, director of the department's licensing section, said few reports ever have been filed by the Jasper home.

The Register also learned that an 18-year-old woman sterilized in 1970 was not retarded or mentally disabled, but an "impulsive, hair-triggered young girl," in

the words of Dr. Roy C. Sloan, the home's psychiatrist.

He said the decision to sterilize the resident, Robin Woody, was made by her parents and himself. He does not recall whether Woody agreed to the operation, but a woman who was a nurse at the home at the time said "she didn't want it at all."

*Forced Sterilization*

"For two to three weeks when I came to work she was crying," said Collene Blakely of Newton. "She was told the only way she could be dismissed from the home is if she would agree to be sterilized."

Dr. Sloan denied that, saying, "We don't think in terms of punishment. That child—she was a young girl—was a very explosive, impulsive young girl largely without controls over her aggressive and, at times, irrational behavior."

He said she was sterilized because "she would be a very questionable risk as far as having and rearing a baby. The people who hold on that way are those who move on to child abuse."

Robin's mother, Mrs. Gladys Woody of Newton, said she agreed with the decision then and now. She would not discuss the matter further.

Woody was discharged from the home Dec. 29, 1971, and Mrs. Woody does not know where she is living.

*6 Sterilizations*

The State Board of Eugenics reports six sterilizations—all of women—were approved from the Jasper home in the last five years.

Officers of the board, who are trying to get it abolished by the Legislature, say they do not enforce a 1936 state law allowing sterilizations for persons believed likely to bear a child having "an inherited tendency to mental retardedness, syphilis (sic), mental illness, epilepsy, criminality, or degeneracy or who would probably become a social menace or ward of the state."

"We never approved a sterilization for anybody who was unruly or a discipline problem," said Theresa Weiser, executive secretary of the board. "They had to be severely mentally retarded."

The board approved 176 sterilizations in the last five years; 39 were denied.

Although it is not required that sterilization cases go before the board, Dr. Sloan said the home began sending its requests there in 1972.

"There was a great deal of concern and local criticism emanating from certain people that perhaps there might not have been a need for sterilizations, that there were some shenanigans going on," he said.

Dr. Sloan said he decides whether to recommend the surgery on the basis of "whether that person is capable of being able to become a parent and be responsible for a child."

*Chronically Ill*

"One of the very sound reasons (for surgery) is for a chronically and severely ill person whose behavior is such that it impairs their judgment so that sex and pregnancy would be considered a desirable thing to accomplish," he said.

He said he cannot recall how many residents were sterilized in his eight years at the home, but that all were women and "a number" weren't retarded. He noted that "probably three or four of the individuals did sign a statement" consenting to the operation. The women's guardians always approved the surgery, he said.

Apparent irregularities involving drugs brought the facility to the attention of another state agency. The home, and the drug firms supplying it, apparently were in violation of policies of the Iowa Board of Pharmacy Examiners for years before the home was granted its first pharmacy license in February, 1973.

Before that time, the late George Weirick, Sr., a pharmacist registered at his Colfax drugstore, would travel to the

home one afternoon a week, working with the drugs that had been delivered there. Board rules say prescription drugs cannot be sent to an address other than the one at which a pharmacist is licensed.

The only exception is if a doctor registers with the state to be responsible to receive and lock up any drugs. No doctor was so registered at the Jasper home.

Paul Crews, executive secretary of the pharmacy board, said when a complaint about this situation was filed in 1972, the board insisted a license be obtained.

"We could have filed a criminal charge, but they were purchasing it (prescription drugs) out of ignorance," he says. "You do have to be reasonable in these matters."

Weirick's son, George, who is the home's current pharmacist, said this rule was never explained by the examiners and drugs usually were delivered to the nurse in charge, who would lock them up.

Crews said although the home can be excused, the companies shipping the drugs should have known it was illegal. Action was not taken against the firms, Crews said, because they were from outside Iowa and the board has no power over them.

When informed one of the home's major suppliers was the J. W. Edgerly Co. of Ottumwa, Crews said, "Following our established procedures, I know they were admonished."

### Knew Nothing

Jay Anderson, president since 1974 of the Ottumwa firm, knew nothing about any admonition or where the drugs were sent. He said no invoices listing addresses were kept, but said it was thought a pharmacist was at the home when the drugs were received.

Drugs also were dispensed haphazardly, a former pharmacist at the home charges. Martin Ogden, 41, said he was asked by the younger Weirick, his former drugstore partner, to work at the home in May, 1973.

Ogden said keys to the nurse's medication room often were left in the open. He said he first became alarmed when he saw an employe who was a former patient attempting to prepare medicine trays while "in a state of intoxication either by alcohol or drugs."

"There was a very definite oversupply of medication and I was frightened for my license when I saw the very slipshod drug procedures there," Ogden said. "A patient, an obviously insane man, reached into his pockets and pulled out two fistfuls of drugs on another occasion."

Charges of overmedication were echoed by former nurse Blakely and activities director Vivian DeGreef, 50. Registered nurse Colleen Haft, who has worked at the home for 14 years, said most of the residents get medicine two or three times daily.

### Defends Practices

Dr. Sloan defended the home's drug use. "My judgment has to prevail and I would question what people say who probably don't have a qualified opinion," he said.

Ogden said his problems at the home contributed to the end of his partnership. Ogden's work at the home was terminated by former county supervisor Carroll Eichner after he set a coat-hanger booby trap to discover if anyone entered the pharmacy in his absence.

Ogden asked for a pharmacy examiner's audit when he left Dec. 7, 1973. In the report given to the Board of Supervisors, the pharmacy examiner said no significant quantity of drugs was unaccounted for. The report did insist the pharmacist hold the only key to the drug room, one of Ogden's complaints. Dr. Ferguson said Ripper and the Board of Supervisors then gave up their keys.

A rapid staff turnover adds to the home's problems, said DeGreef, who left her job as activities director Jan. 5. She estimated 30 to 35 employes have left the home in the last six months. Supervisor Wayne Taylor has said an employe was

fired recently for being drunk and another for charging personal items to the county.

Other complaints were aired at a public meeting that filled the county courtroom Feb. 7. Although Taylor said he and supervisor Francis Van Zante called the meeting with the intention of immediately closing it to interview an applicant for administrator, public pressure reopened the meeting after 70 minutes.

Several citizens chastised the two men for ignoring the third supervisor, Jeanne Bridenstine. Van Zante admitted he and Taylor had met three times at the home without Bridenstine.

Other complaints raised during the meeting include:

A charge by Charles Gifford of Newton, a former county Democratic chairman, that 39 absentee ballots were filled out in the 1964 election for residents of the home who were incapable of voting, including his brother, Dale. The ballots were thrown away when contested, Gifford said.

A November, 1973, accident in which two residents of the home burned to death when a truck rammed into the home's station wagon as it was traveling slowly on the interstate.

Police said Clarence Ripper had taken three residents and an employe to round up cattle owned by Jack Wormley, a former state senator, that had strayed onto Interstate 80.

The home's car was struck from rear, exploding its gas tank. The third resident was burned severely, had fingers amputated and spent seven months in University Hospitals at Iowa City recovering.

Taylor defends the home as one of the best in Iowa and credits it with serving people other homes reject. In recent months the facility has temporarily housed 2-, 3- and 5-year-olds waiting for transfer to foster homes, a 42-year-old woman serving a jail sentence there and many teen-aged runaways.

Some 76 of the home's 144 residents are mental patients. Wild, of the health department, said these residents should be moved to the Mount Pleasant mental institution, where they could be better served.

A hearing on whether to revoke the home's state custodial and nursing home licenses will be held before Mar. 27. The Jasper County attorney has appealed the state department's action and is awaiting specific charges behind the list of violations alleged in the Jan. 30 revocation notice.

In their answer, the newspaper and Engel admitted publication of the article but denied the material invasion of privacy allegations. They also asserted affirmative defenses on constitutional, newsworthiness, public record and waiver grounds.

They repeated these allegations in moving for summary judgment. Affidavits and depositions of several persons were offered in support of the motion.

In resisting the motion, plaintiff denied the relevancy and sufficiency of the proof in support of the motion and offered her affidavit in which she denied the basis of defendants' waiver defense. She also alleged she lived in Des Moines at the time of defendants' investigation, at an address known by her parents, but was not contacted prior to publication of the article.

Defendants' depositions and affidavits showed that plaintiff was actually sterilized in 1971 rather than 1970 as reported in the article. She was then an eighteen-year-old resident in the Jasper County Home. The incident was not a matter of public knowledge at the time it occurred.

The summary judgment record showed other relevant circumstances.

Myrle J. Corso was employed as a nurse's aide at the Jasper County Home from September 1, 1971, to November 1, 1971, when she voluntarily left her employment. She complained about conditions in the home to Opal M. Snyder of Newton, who wrote a column for a local daily newspaper and published a bimonthly newsletter. At Snyder's request, Corso prepared a written

statement detailing ten specific situations which she had observed. They included several incidents of patient abuse and neglect and of mishandling of drugs. They also included instances of involuntary sterilization. Two women other than plaintiff were identified as having been sterilized against their will.

Upon Snyder's recommendation, Corso mailed copies of her statement to Governor Robert D. Ray, the State Department of Health, defendant newspaper, and several other persons and groups.

Subsequently, Snyder searched the county warrant register and claim record in the county auditor's office and found that the county had paid for surgery for the two women named by Corso. She also found that the county had paid for surgery for plaintiff, surgery which she suspected was also a sterilization. She confirmed this through a telephone call to the hospital bookkeeper. Snyder protested the sterilizations through a series of letters and telephone calls to the hospital, various doctors and the State Board of Eugenics. The hospital notified Snyder it would not perform additional sterilizations of residents in the home without approval of the eugenics board.

The State Department of Health investigated the home on the basis of the Corso statement. Defendant newspaper published an account of that investigation in January 1972 but did not mention the allegations about sterilizations. The state's investigative report was not made public. In June 1975 the health department issued a report listing numerous deficiencies in the operation of the home.

Snyder had remained concerned about the conditions in the home and was particularly disturbed that the home administrator had dismissed a pharmacist who was attempting to implement proper procedures for handling drugs. She was convinced that despite state action taken pursuant to the Corso complaint no improvement in the operation of the home had occurred since 1972.

She decided to express these concerns to Governor Ray personally and in writing.

In July 1975 she wrote a letter to the Governor with which she enclosed a statement by Collene Blakely, a former nurse's aide at the home. The Blakely statement was as follows:

I worked at the Jasper County Home from January to August, 1971. One of the many problems I witnessed during that time concerned an 18 or 19 year old patient, Robin Woody.

One day, when I came to work I found Robin on her bed, crying. When I inquired as to the problem she told me that she had been called to Riva Ripper's office and was told by Mrs. Ripper that she, Robin, would be released if she agreed to be sterilized. Mrs. Ripper is the stewardess at the County Home. If she didn't agree she would have to remain at the Jasper County Home indefinitely.

When I left employment at the County Home, Robin Woody was preparing to enter the hospital the next week. I do not remember the reason that was given by Mrs. Ripper, but Robin told me it was really for the sterilization.

About a year later I saw her at a park in Newton. She told me at that time that she had been released because she "gave up her rights to be a person". Snyder met with Governor Ray and his press secretary, Richard Gilbert. She discussed the situation and left data with them, including the Corso statement. In a follow-up letter to the Governor, she included a lengthy written statement reciting the history of the problems in the home and her concerns about them. Her statement included a detailed discussion of the sterilizations and referred to the "Woody girl" as one of the victims. No request for confidentiality was made.

The Governor's office started a file in which copies of the documents furnished by Snyder were placed. The originals were subsequently returned to Snyder. Copies were sent by the Governor to the Commissioner of Health with a request for investigation of the allegations.

In January 1976 the state health department revoked the nursing and custodial licenses of the home because of its alleged

failure to correct the deficiencies listed in its report of June 1, 1975. The original list of sixty-seven alleged violations had grown to one hundred twenty. The violations included a charge of physical, mental, and verbal abuse of patients. County supervisors, legislators, physicians, the county attorney, and other persons discussed the charges with the administrator and staff members of the home in a meeting held on January 30, 1976. Engel attended this meeting. The home administrator denied the charges, and a member of the county board of supervisors attributed the allegations to disgruntled former employees. The controversy was reported by the media, including defendant newspaper.

Various other news reports followed, including the story which is involved in this case. On February 3 a story appeared in which a threat against one of the county supervisors was reported. On February 4 a story written by defendant Engel reported a delay in a hearing scheduled by the board of supervisors to discuss revocation of the licenses. A supervisor was quoted as describing the former employees who complained about the home as "rabble-rousers that caused the problem."

The board of supervisors held several emergency meetings to respond to problems at the home. These meetings received extensive media coverage. Community feelings were aroused; rumors and accusations abounded. Considerable controversy existed about the merits of the department of health action.

On February 8 defendant newspaper carried a story written by Engel reporting the resignations of the administrator and head nurse of the home. Then on February 15 the story which is the subject of the present lawsuit appeared. The story commenced on page 1, but most of it, including the portion in which plaintiff's sterilization was discussed, was continued to page 8A.

Prior to writing the February 15 article, Engel spent two weeks investigating the problems at the home. During the course of her investigation she interviewed Opal Snyder, who showed Engel the documents she had given to the Governor, including her statement and that of Collene Blakely, both of which identified plaintiff as a sterilization victim. She also interviewed Blakely, Dr. Sloan, and the administrator of the home, all of whom confirmed the sterilization. She verified the term of plaintiff's residency and date of surgery through the county auditor's records. She discussed this and other matters with thirty-eight persons who had knowledge of relevant events. Although she attempted to locate plaintiff, she could not find her through records or other means. She was unable to document the sterilizations of the other women as completely as she could plaintiff's.

After the motion for summary judgment was submitted on this record, the trial court sustained the motion on the ground it could not be found that the disclosure of plaintiff's sterilization was not newsworthy. Plaintiff appealed.

■ Before considering the public record and newsworthiness grounds of defendants' motion, we address defendants' contention that first amendment considerations create a presumption in favor of summary judgment in cases of this kind. Among other authorities, they cite our decision in *McCarney v. Des Moines Register and Tribune Co.*, 239 N.W.2d 152 (Iowa 1976).

Neither *McCarney* nor other cited cases support this contention. *McCarney* involved application of the actual malice standard of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). We there quoted with approval a principle from *Cerrito v. Time, Inc.*, 302 F.Supp. 1071, 1075–76 (N.D.Cal.1969), *aff'd*, 449 F.2d 306 (9th Cir. 1971), enunciating the duty of courts in such cases to enforce the constitutional *New York Times* standard by granting summary judgment when the record establishes the plaintiff cannot meet his burden under it. 239 N.W.2d at 157.

This principle is intended to emphasize a duty of close scrutiny of summary judgment motions in cases which may have a chilling effect on first amendment rights. However, it does not change the rules governing summary judgment:

The *standard* against which the evidence must be examined is that of *New York Times* and its progeny. But the *manner* in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury. If the evidence, so considered, measures up to the *New York Times* standard, the case is one for the jury

. . . . .

*Guam Federation of Teachers, Local 1581 v. Ysrael*, 492 F.2d 438, 441 (9th Cir.), *cert. denied*, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974) (emphasis in original). This principle has been applied to an action like the present one for invasion of privacy based on giving publicity to private facts. *See Virgil v. Time, Inc.*, 527 F.2d 1122, 1130–31 (9th Cir. 1975), *cert. denied*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976). We hold it is applicable here. However, we do not say a presumption exists in favor of summary judgment in cases like this. Instead we do no more than recognize that the first amendment requires special care to assure that the summary judgment rules are enforced when invoked in cases of this kind.

This brings us to the determination of whether the trial court erred in sustaining the motion for summary judgment in this case.

■ *I. The public record ground.* The public record defense arises from two limitations upon a cause of action for invasion of privacy under *Restatement of Torts (Second)* § 652D.

■ One is that the publicity must concern the private, as distinguished from the public, life of the individual. As noted in Comment b to *Restatement* section 652D, "There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public." *See* Warren & Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193, 214 (1890). We recognized and applied this limitation in *Winegard v. Larsen*, 260 N.W.2d 816, 823 (Iowa 1977).

■ The other limitation is that the individual must prove the matter publicized is of a kind that "is not of legitimate concern to the public." Liability for disclosing public information is foreclosed on this basis because matters of public record are, as a matter of law, of legitimate concern to the public. *See Restatement* § 652D, Comment d (1977); *see also Winegard*, 260 N.W.2d at 823 ("Under this rule defendants could not be held liable for publicizing matters contained in Judge Hendrickson's ruling.").

In commenting on the *Restatement* principles in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 494–95, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328, 349 (1975), the United States Supreme Court said:

Thus even the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record. The conclusion is compelling when viewed in terms of the First and Fourteenth Amendments and in light of the public interest in a vigorous press.

The *Restatement* authors assert that the *Cox* holding precludes an action for invasion of privacy when the subject matter of the publicity is information which is available from public records. *See Restatement* § 652D, Special Note on Relation of § 652D to the First Amendment to the Constitution ("The case of *Cox Broadcasting Co. v. Cohn* (1975) 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 holds that under the First Amendment there can be no recovery for disclosure of and publicity to facts that are a matter of public record."). In *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 840, 98 S.Ct. 1535, 1542, 56 L.Ed.2d 1, 11 (1978), the Supreme Court confirmed the accuracy of the *Restatement* view when it characterized the *Cox* case by saying, "Our holding there was that a civil action against a television station for breach of privacy could not be maintained consistently with the First Amendment when the station had broadcast only information which was already in the public domain."

■ Therefore, under *Cox*, the *Restatement* principles which preclude an invasion of privacy action for accurate disclosure of information contained in public records are mandated by the first amendment to the Federal Constitution.

■ The issue here is whether the fact of plaintiff's 1971 sterilization was a matter of public record at the time of the newspaper disclosure.

An affidavit of Richard Gilbert states that the documents furnished to Governor Ray by Opal Snyder in July 1975 were placed in the working files of the Governor's office. After being copied, the originals were returned to Mrs. Snyder. In November 1976, after he had left the Governor's employ and had entered employment with the defendant newspaper, Gilbert asked the Governor's administrative assistant for the file on the Jasper County Home and it was willingly produced for his examination. It contained copies of the documents furnished by Snyder which identified plaintiff as a 1971 sterilization victim.

The Jasper county auditor's records showed a claim and warrant for plaintiff's surgery, although they did not reveal its nature.

Whether these records were public depends upon application of the provisions of Code chapter 68A, Iowa's Freedom of Information Act. The history of this legislation is discussed in Note, *Iowa's Freedom of Information Act: Everything You've Always Wanted to Know About Public Records But Were Afraid to Ask*, 57 Iowa L.Rev. 1163 (1972). As originally proposed, the Act purported to designate all documents in the legal possession of a public official as public records. Specific exemptions contained in section 68A.7 were added by floor amendment. *Id.* at 1177–78.

■ Section 68A.1 defines "public records" as "all records and documents of or belonging to this state or any county . ., or any branch, department, board, bureau, commission, council, or committee of any of the foregoing." The statute provides a broader definition of public records than existed at common law. *Compare Des Moines Register and Tribune Co. v. Osmundson*, 248 N.W.2d 493, 501 (Iowa 1976), *with Linder v. Eckard*, 261 Iowa 216, 220, 152 N.W.2d 833, 836 (1967). Moreover, section 68A.2 gives citizens the right to copy and the media the right to publish these public records unless a statutory exemption

or provision, such as section 68A.7, specifies otherwise or unless an injunction against disclosure is entered pursuant to section 68A.8. *Osmundson*, 248 N.W.2d at 502; *see* Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process*, 60 Iowa L.Rev. 731, 778 (1975) (suggesting Act should be construed broadly).

■ To facilitate public scrutiny of the conduct of public officers, the statute generally permits public access to writings held by them in their official capacities, regardless of origin. *See MacEwan v. Holm*, 226 Or. 27, 359 P.2d 413 (1961); 66 Am.Jur.2d *Records and Recording Laws* § 19, at 354 (1973).

We believe the Act is accurately characterized in Note, *Iowa's Freedom of Information Act, supra* at 1166, as follows:

The intent of chapter 68A, and thus the manner of its construction, are manifest in organizational concepts underlying the statutory format. The first of the chapter's four identifiable thrusts establishes the statutory definition of "public records," and is meant to be the *sine qua non* of the process of decision leading to access to public records. Following this definition of public records, the statute delineates a broad grant of inspection rights applicable to all public documents, subject only to express limitations found elsewhere in the Code. The third step in the statutory scheme establishes a list of express and specific limitations on the right of access. The final organizational construct permits concealment of public records under circumstances where public access would cause substantial and irreparable harm to any individual and no public interest would be served. By this format, the statute would appear to establish a liberal policy of access from which departures are to be made only under discrete circumstances.

We limit our application of the statute in this case to the documents involved here. We have no occasion to determine whether the reach of the statute may be affected by

constitutional provisions in other situations. *Cf. Sadler v. Oregon State Bar*, 275 Or. 279, 550 P.2d 1218 (1976) (holding statute which allowed public inspection of bar association records of complaints about attorney conduct did not substantially impair the inherent power of the judicial branch to regulate the bar).

The auditor's records were required to be kept by statute, *see* § 230.26, The Code 1966, and would have been deemed public records even before chapter 68A was enacted. *Linder v. Eckard*, 261 Iowa at 220, 152 N.W.2d at 836. They are well within the definition of public records in chapter 68A. *See Osmundson*, 248 N.W.2d at 501.

■ The Snyder and Blakely documents which were filed in the Governor's office also clearly come within the definition of public records in section 68A.1. Upon his acceptance of custody, the documents were in the lawful possession of his office and hence became documents "of or belonging to" the state. Furthermore, the documents are not exempted from disclosure by a specific statutory provision as section 68A.2 requires. No injunction was secured under section 68A.8, and no exemption under a section outside chapter 68A appears available. Section 68A.7(2), which exempts "hospital records" and "medical records" of a "patient or former patient, including outpatient," does not apply because the documents here were neither compiled for diagnostic or treatment purposes by hospital or medical personnel nor maintained as records of a hospital or physician. They are not hospital or medical records within the meaning of the statute. *See* Attorney General's Opinion 75–7–2, *reprinted in* [1975–76] Iowa Att'y Gen. Biennial Rep. 160–62 (holding that auditor's records relating to alcoholic treatment are not within the exemption).

We think this case comes within the limitations on the tort imposed in *Restatement* § 652D and applied in *Winegard*. Because the documents were public, the information which they contained was in the public domain. *Osmundson*, 248 N.W.2d at 503.

The fact of plaintiff's sterilization was thus a public as opposed to a private fact and a matter of legitimate public concern. Therefore the disclosure is not actionable.

*See Winegard*, 260 N.W.2d at 823; *Metter v. Los Angeles Examiner*, 35 Cal.App.2d 304, 95 P.2d 491 (1939); *Meetze v. Associated Press*, 230 S.C. 330, 95 S.E.2d 606 (1956).

This ground is sufficient to support the summary judgment.

*II. The newsworthiness ground.* The second ground which we consider is defendants' contention that the trier of fact would be precluded from finding that the disclosure was not of legitimate concern to the public because not newsworthy. Under the elements of the tort defined in *Restatement* section 652D, it is necessary for the plaintiff to prove the lack of newsworthiness of the disclosure as well as its invasiveness. Newsworthiness is thus not an issue of privilege which must be urged defensively but an element which must be negated by the plaintiff in meeting her burden of proof.

We recognized in *Bremmer v. Journal-Tribune Publishing Co.*, 247 Iowa 817, 76 N.W.2d 762 (1956), that the dissemination of news does not constitute an actionable invasion of privacy.

The right of the press to publish news is assured by the first amendment guarantees of free speech and free press. The constitutionality of an invasion of privacy action predicated on the publication of truthful information has not yet been determined by the United States Supreme Court. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328, 347 (1975). However, the Court has noted that, "[b]ecause the gravamen of the claimed injury is the publication of information, whether true or not, the dissemination of which is embarrassing or otherwise painful to an individual, it is here that claims of privacy most directly confront the constitutional freedoms of speech and press." *Id.* at 489, 95 S.Ct. at 1043, 43 L.Ed.2d at 346. Even though the Supreme Court has not decided the related question whether the first and fourteenth amendments require truth to be recognized as a defense in defamation actions brought by a person who is not a public officer or public figure, the seriousness of the issue is emphasized by the Court's holding that liability cannot be

imposed in such actions without proof of fault. *See Gertz v. Welch*, 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789, 809 (1974).

The right of privacy is a fundamental social value which is also constitutionally protected. *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147, 176 (1973) ("the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution"). We recognize a public interest in preventing wrongful intrusions into privacy. *See Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597, 609 (1966) (Stewart, J., concurring) ("The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.")

The common-law tort based upon giving publicity to the private life of another balances these constitutional interests. Redress is permitted for such publicity when the matter publicized is of a kind that "would be highly offensive to a reasonable person," but only when it also "is not of legitimate concern to the public." *Restatement* § 652D. Under this theory, invasion of privacy for a truthful disclosure is actionable only if the publicity is not newsworthy.

Publicity need not be informative, entertaining, timely or important to be entitled to first amendment protection. *Time Inc. v. Hill*, 385 U.S. 374, 388, 87 S.Ct. 534, 542, 17 L.Ed.2d 456, 467 (1967). At the very least news includes discussion of "all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama*, 210 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093, 1102 (1940).

Because we have adopted the *Restatement* definition of the invasion of privacy tort, it is reasonable to refer to the *Restatement* explanation of its elements. "News" is discussed in Comment g to section 652D as follows:

Included within the scope of legitimate public concern are matters of the kind customarily regarded as "news." To a considerable extent, in accordance with the mores of the community, the publishers and broadcasters have themselves defined the term, as a glance at any morning paper will confirm. Authorized publicity includes publications concerning homicide and other crimes, arrests, police raids, suicides, marriages and divorces, accidents, fires, catastrophes of nature, a death from the use of narcotics, a rare disease, the birth of a child to a twelve-year-old girl, the reappearance of one supposed to have been murdered years ago, a report to the police concerning the escape of a wild animal and many other similar matters of genuine, even if more or less deplorable, popular appeal.

Insofar as relevant, "private facts" are explained in Comment h as follows:

Permissible publicity to information concerning either voluntary or involuntary public figures is not limited to the particular events that arouse the interest of the public. That interest, once aroused by the event, may legitimately extend, to some reasonable degree, to further information concerning the individual and to facts about him, which are not public and which, in the case of one who had not become a public figure, would be regarded as an invasion of his purely private life. Thus the life history of one accused of murder, together with such heretofore private facts as may throw some light upon what kind of person he is, his possible guilt or innocence, or his reasons for committing the crime, are a matter of legitimate public interest. . . . On the same basis the home life and daily habits of a motion picture actress may be of legitimate and reasonable interest to the public that sees her on the screen.

The extent of the authority to make public private facts is not, however, unlimited. There may be some intimate details of her life, such as sexual relations, which even the actress is entitled to keep to herself. In determining what is a matter of legitimate public interest,

account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern. The limitations, in other words, are those of common decency, having due regard to the freedom of the press and its reasonable leeway to choose what it will tell the public, but also due regard to the feelings of the individual and the harm that will be done to him by the exposure. Some reasonable proportion is also to be maintained between the event or activity that makes the individual a public figure and the private facts to which publicity is given. Revelations that may properly be made concerning a murderer or the President of the United States would not be privileged if they were to be made concerning one who is merely injured in an automobile accident. Passage of time is a relevant factor, with other facts, in determining whether the publicity involves a matter of legitimate public concern. *Restatement* § 652D, Comment k.

The *Restatement* comments reveal an analogy between the standard applicable on the issue of newsworthiness and the standard used in obscenity cases. Each standard is carefully circumscribed by constitutional restrictions, each is accompanied by examples, and each contemplates a decision based upon community mores. "The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the community, with decent standards, would say he had no concern." *Restatement* § 652D, Comment h; *see Virgil v. Time, Inc.*, 527 F.2d at 1129. *See also* Woito and McNulty, *The Privacy Disclosure Tort and the First Amendment: Should the Community Decide Newsworthiness?*, 64 Iowa L.Rev. 185 (1979).

We must decide under the present record whether a reasonable person applying the community standard could find the disclosure of which plaintiff complains was a morbid and sensational prying into her life for its own sake.

The article is an example of investigative journalism. Its obvious purpose was to bring the problems of the Jasper County Home to public attention. In chronicling alleged abused in the home, defendants portrayed a pattern of incidents which cumulatively established more reason for public concern about management of the home than would any one incident viewed in isolation. This journalistic technique is basic and legitimate.

Cases holding disclosure of past events to be actionable are distinguishable. In *Briscoe v. Reader's Digest Ass'n*, 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (1971), the rehabilitated plaintiff's eleven-year-old conviction of truck highjacking had no discernible relationship to an exposé of current highjacking. Similarly, the disclosure in *Melvin v. Reid*, 112 Cal.App. 285, 297 P. 91 (1931), of the rehabilitated plaintiff's identity as a prostitute who had been tried for murder eight years before was unrelated to any current public issue. Furthermore, the subsequent *Cox Broadcasting Corp.* holding would affect *Briscoe* and *Melvin* if they were decided today because each involved past matters of public record.

■ In determining whether an item is newsworthy, courts cannot impose their own views about what should interest the community. Courts do not have license to sit as censors. As stated by the court in *Sidis v. F–R Publishing Corp.*, 113 F.2d 806, 809 (2d Cir.) *cert. denied*, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940):

Regrettably or not, the misfortunes and frailties of neighbors and "public figures" are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day.

In addition to being unwise, it would infringe the first amendment for courts to allow recovery to persons offended by publication of matters of legitimate public concern. *See Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978).

Plaintiff concedes the article in this case was newsworthy, but she asserts the disclosure of her identity was not. We do not believe the disclosure of her identity can be taken out of context.

In determining whether the disclosure had news value, it is helpful to consider the relationship between the invasive disclosure and the newsworthy subject(s) of the article; the contribution of the disclosed facts to the subject matter of the article—whether it adds credibility, contributes further information not otherwise communicable, contributes to reader perception and understanding, or augments readership by drawing attention to the story; and the constitutional value of the contribution of the disclosure, including its necessity in achieving its purposes. Bezanson, *Public Disclosures as News: Injunctive Relief and Newsworthiness in Privacy Actions Involving the Press,* 64 Iowa L.Rev. 1061, 1098 (1979). This analysis requires an inquiry into the relevance, impact and value of the disclosure. *Id.* at 1099.

Here the disclosure of plaintiff's involuntary sterilization was closely related to the subject matter of the news story. It documented the article's theme of maladministration and patient abuses at the Jasper County Home. The home had been under the same administration for twenty-two years. Public controversy concerning alleged deficiencies in administration had existed for seven years. The incidents of involuntary sterilization were central to this ongoing dispute. Plaintiff's experience in 1971 was plainly relevant with other past events in evaluating the home's administration.

In the sense of serving an appropriate news function, the disclosure contributed constructively to the impact of the article. It offered a personalized frame of reference to which the reader could relate, fostering perception and understanding. Moreover, it lent specificity and credibility to the report.

In this way the disclosure served as an effective means of accomplishing the intended news function. It had positive communicative value in attracting the reader's attention to the article's subject matter and in supporting expression of the underlying theme.

Examined in the light of the first amendment, we do not believe the disclosure could reasonably be held to be devoid of news value. *See* Bezanson, *supra* at 1099–104.

Assuming, as plaintiff agrees, the newspaper had a right to print an article which documented extrastatutory involuntary sterilizations at the Jasper County Home, the editors also had a right to buttress the force of their evidence by naming names. We do not say it was necessary for them to do so, but we are certain they had a right to treat the identity of victims of involuntary sterilizations as matters of legitimate public concern. The subject is one of grave public interest. *See, e. g., Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). Moreover, at a time when it was important to separate fact from rumor, the specificity of the report would strengthen the accuracy of the public perception of the merits of the controversy.

This is a far cry from embarrassing people by exposing their medical conditions or treatment when identity can add nothing to the probity of the account. *Cf. Banks v. King Features Syndicate, Inc.,* 30 F.Supp. 352 (S.D.N.Y.1930) (newspaper publication of X ray of identified plaintiff's pelvis showing a hemostat left in her abdomen by a surgeon several years earlier); *Barber v. Time, Inc.,* 348 Mo. 1199, 159 S.W.2d 291 (1942) (periodical publication of story and photograph identifying plaintiff who lost weight despite constant eating); *Feeney v. Young,* 191 App.Div. 501, 191 N.Y.S. 481 (1920) (film of identified plaintiff undergoing Caesarean section).

The disclosure of plaintiff's identity in this case could not reasonably be viewed as the spreading of gossip solely for its own sake. *See Johnson v. Evening Star Newspaper Co.*, 120 U.S.App.D.C. 122, 344 F.2d 507, 508 (D.C. Cir. 1965) ("The identifying details were incidental to the story and were not an enlargement which carried the publication beyond legitimate bounds."); *Virgil v. Sports Illustrated*, 424 F.Supp. 1286, 1288 (S.D.Cal.1976) (decision after remand; test is whether revealing identity goes beyond the giving of information and becomes a morbid and sensational prying into private lives for its own sake.)

In *Jenkins v. Georgia*, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974), the Supreme Court held the Georgia courts erred in submitting the issue of the obscenity of the movie "Carnal Knowledge" to a jury, even though the subject of the movie was sex and it included nudity and scenes purporting to portray sex acts. The Court reasoned:

> Appellant's showing of the film "Carnal Knowledge" is simply not the "public portrayal of hard core sexual conduct for its own sake, and for the ensuing commercial gain" which we said was punishable in *Miller*. . . . We hold that the film could not, as a matter of constitutional law, be found to depict sexual conduct in a patently offensive way, and that it is therefore not outside the protection of the First and Fourteenth Amendments because it is obscene.

418 U.S. at 161, 94 S.Ct. at 2755, 41 L.Ed.2d at 650–51. We believe similar reasoning requires a like result in the present case. A reasonable person could not find the disclosure in this case was not of legitimate public concern under the *Restatement* standard applied in the light of the first and fourteenth amendments. Plaintiff therefore cannot prove an essential element of her cause of action.

We hold that the trial court was right in sustaining defendants' motion for summary judgment on this ground.

AFFIRMED.

REYNOLDSON, C. J., and ALLBEE, J., concur in division II and the result.

UHLENHOPP, J., concurs specially in division II and the result.

McGIVERIN, J., joined by REES, J., concurs in division I and the result and dissents from division II.

HARRIS, J., concurs in the result in division I and joins McGIVERIN, J.'s dissent to division II.

LARSON, J., joined by LeGRAND, J., dissents.

UHLENHOPP, Justice (concurring specially).

I concur in division II of the majority opinion and in the result. I am influenced by a desire not to chill First Amendment rights by a restricted application of newsworthiness.

On the other hand, I would not reach the subject of division I. That division involves the issue of what constitutes a public record *for purposes of the tort of violating a person's privacy.* I would await an appeal which actually necessitates a decision on that subject. Involved *inter alia* is the question whether unsolicited letters written to public officials automatically become public records for purposes of the tort although the letters deal with private affairs which would otherwise be protected by tort law. The privacy of members of the public may hang upon a very slender thread, depending upon our conclusion on this subject.

McGIVERIN, Justice (concurring in part and dissenting in part).

I concur in the result and the opinion except as to Division II from which I respectfully dissent.

As to Division II, I agree with the statement of the majority that "[i]n determining whether an item is newsworthy, courts cannot impose their own views about what should interest the community," but from that premise draw a different conclusion.

I believe a genuine issue of fact existed as to whether publication by defendants newspaper and Engel in 1976 of plaintiff's 1970 or 1971 sterilization was then newsworthy. *See* Iowa R.Civ.P. 237.

I believe there are factors in this case which could lead reasonable persons to differ within the bounds of the first and fourteenth amendments in evaluation of legitimate public concern. Passage of time has been recognized as a significant factor in evaluating newsworthiness. *See Briscoe v. Reader's Digest Association,* 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (1971); *Melvin v. Reid,* 112 Cal.App. 285, 297 P. 91 (1931). Courts, too, have acknowledged that disclosure of identity can be a separate issue in an otherwise newsworthy story. *Briscoe,* 4 Cal.3d at 537, 93 Cal.Rptr. at 871–72, 483 P.2d at 39–40 ("We have no doubt that reports of the facts of past crimes are newsworthy. . . . However, identification of the *actor* in reports of long past crimes usually serves little independent public purpose.") (original emphasis).

Accordingly, a jury or trier of fact should be allowed at trial to apply the community standard articulated in the majority opinion and determine whether disclosure of plaintiff's identity was morbid and sensational prying into her life for its own sake. A jury should decide this issue and not a court on summary judgment.

The court should have overruled the motion for summary judgment as to the newsworthiness ground. Therefore, I dissent from Division II.

REES, J., joins in this special concurrence and dissent.

HARRIS, J., joins as to the dissent to division II.

LARSON, Justice (dissenting).

I join the dissent of Justice McGiverin as to Division II of the plurality opinion. I dissent separately as to Division I.

Under the reasoning of Division I, the information found in the offices of the governor and the Jasper County auditor are "public records" under our freedom of information act and therefore proper subjects of publication. I believe that even if section 68A.2, The Code, would otherwise be available to permit publication of these items of "public" information, they are medical records within the exception to the disclosure act. It is probably true that they are not "medical records" in the traditional sense; and it may be conceded as the plurality contends that they were "neither compiled by a hospital or medical personnel nor maintained as records of a hospital or physician." However, the statute does not impose any such restrictions, and I believe it would be inconsistent with the spirit and context of the act for us to impose them. If the items of information here·are "records" under the act as contended by the plurality, it is only necessary to determine whether they are *medical* records for purposes of the exception. They are "medical" records if they pertain to "condition, diagnosis, care or treatment." § 68A.7(2), The Code. These records here did pertain to medical treatment of the plaintiff. She was sterilized by surgical procedure.

The underpinning of this statutory exception is, I believe, a recognition of the deeply personal and sensitive nature of medical information. This exception should be interpreted to effect this strong policy consideration. Dean Wigmore, while criticizing the analogous doctor-patient privilege, recognized some justification for the privilege in sex-related medical evidence. 8 J. Wigmore, *Evidence in Trials at Common Law* § 2380(a), at 830 (McNaughton rev. ed. 1961). Justice Blackmun, in advocating a broad scope of the medical file exception to the federal disclosure act, also recognized the strong policy considerations attending dissemination of medical information, saying:

It is almost inconceivable to me that the Court is willing today to attach the qualification phrase to medical files and thereby open to the public what has been recognized as almost the essence of ultimate privacy. The law's long established physician-patient privilege establishes this. Anyone who has had even minimal

contact with the practice of medicine surely cannot agree with this extension by judicial construction  .  .  . .

*Department of the Air Force v. Rose*, 425 U.S. 352, 387–88, 96 S.Ct. 1592, 1611, 48 L.Ed.2d 11, 36 (1976) (dissenting opinion).

I believe the publication here could reasonably have been found by a factfinder to improperly invade plaintiff's privacy, and that chapter 68A does not place the underlying information into the public domain so as to emasculate the right to pursue that claim without a trial.  I would reverse and remand for trial on the merits.

LeGRAND, J., joins in this dissent.