304 N.W.2d 239 (1981)
Phyllis M. ANDERSON, Appellant, Cross-Appellee,
v.
The LOW RENT HOUSING COMMISSION OF MUSCATINE, Iowa; George Six; and Jeffrey Schott, Acting Community Development Director, Cross-Appellants,
Appeal of the CITY OF MUSCATINE, Iowa.
Nos. 63597, 63834.
Supreme Court of Iowa.
April 15, 1981.
*242 Bruce Washburn, Iowa City, for appellant, cross-appellee.
John D. Stonebraker of McDonald, Stonebraker & Cepican, Davenport, and Patrick M. Ryan of Eckhardt, Goedken, Hintermeister & Ryan, Muscatine, for appellee and cross-appellants.
Considered by LeGRAND, P. J., and UHLENHOPP, McGIVERIN, LARSON, and SCHULTZ, JJ.
SCHULTZ, Justice.
This consolidated appeal grew out of a suit in five divisions based on libel, invasion of privacy, and wrongful discharge from employment. The plaintiff, Phyllis M. Anderson (Anderson), was formerly employed as a secretary in the Community Development Department of defendant City of Muscatine, Iowa (City); her immediate supervisor was defendant Jeffrey Schott (Schott), the city's Acting Community Development Director. Defendant Low Rent Housing Commission of Muscatine, Iowa (LHA), was established by ordinance under the provisions of chapter 403A, The Code 1970, and is governed by five commissioners, one of whom is defendant George Six (Six).
During the course of her employment from January 1975 until she was dismissed on February 17, 1976, fifty-four weeks later, Anderson was in the midst of a controversy, which received widespread coverage from the news media, involving city projects, officials, and fellow employees. This multi-party action stems from that controversy. In the trial below Anderson contended that she was wrongfully discharged. She claimed she had a constitutionally protected liberty interest in her employment, and that the circumstances underlying the termination of that employment deprived her of due process of law in violation of the fourteenth amendment to the United States Constitution. She also maintained that she was the victim of a libel by Six and LHA on October 20, 1975, and that the City and Schott invaded her privacy on February 17, 1976, by disclosing the facts surrounding her termination to the media.
The wrongful termination claim, which was tried to the court, was dismissed. Anderson appeals from that ruling. We affirm. LHA and Six appeal from a judgment entered in part on jury verdicts rendered in favor of Anderson on the libel claim. We reverse and remand. Schott appeals from the portion of the judgment entered on jury verdicts awarding Anderson actual and punitive damages on the invasion of privacy claim. We affirm. Schott also claims the trial court erred in allowing the admission of an exhibit introduced for the limited purpose of showing that Anderson typed the exhibit at the mayor's request. We find no error in that ruling.
I. Jurisdiction of Anderson's appeal. Since there was some question as to whether or not Anderson's appeal was taken from a nonfinal judgment, we required the parties to brief the issue.
Anderson appeals from the trial court's dismissal of her wrongful termination claim, which was tried to the court while her other claims were simultaneously tried to a jury. At the time the trial court issued its ruling on the wrongful termination claim, the jury had returned verdicts on the other claims, and posttrial motions were pending on those claims. The nonfinality issue arose because Anderson appealed from the adverse ruling on the wrongful termination claim prior to the time the trial court ruled on the posttrial motions.
Anderson claims that the ruling on the wrongful termination claim was a final judgment within the meaning of Iowa R.App.P. 5. We need not decide the accuracy of this assertion, however, because we conclude that Iowa R.App.P. 1(c), which became effective July 1, 1980, is dispositive of this jurisdictional issue. Appellate rule 1(c) provides:
If an appeal to the supreme court is improvidently taken because the order from which appeal is taken is interlocutory, this alone shall not be ground for dismissal. The papers upon which the appeal *243 was taken shall be regarded and acted upon as an application for interlocutory appeal under rule 2, rules of appellate procedure, as if duly presented to the supreme court at the time the appeal was taken.
In Smith v. Partnership of Korf, Diehl, Clayton and Cleverley, 302 N.W.2d 137, 138 (Iowa 1981), we held that appellate rule 1(c) is to be given retrospective effect and thus applies to all appeals pending on its effective date, as well as those perfected thereafter.
It should be noted, however, that the rule permits us to grant appeal only as if application had been made under appellate rule 2. Appellate rule 2 allows us to entertain an appeal on an interlocutory ruling upon finding that the ruling "involves substantial rights and will materially affect the final decision and that a determination of its correctness before trial on the merits will better serve the interests of justice." We determine that the present case meets the requirements of appellate rule 2. We therefore focus our attention on the merits of this appeal.
II. Liberty interest. Anderson's petition, as amended, alleged that the City and Schott wrongfully terminated her employment, depriving her of due process of law. Before the issues were submitted to the jury, the trial court sustained Anderson's motion to withdraw the wrongful termination claim from the jury and have the court determine the issue. The trial court subsequently dismissed the claim, ruling that Anderson did not have a constitutionally protected liberty interest, and that even if she did she was afforded due process. Anderson contends the trial court erred in so ruling. We must first determine whether Anderson had a constitutionally protected liberty interest which was affected by her discharge.
"Liberty interest" is a general, somewhat nebulous, term whose definition depends on the context in which it is used. The concept has its origin in the due process clause of the fourteenth amendment to the United States Constitution: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law. . . ." As applied to public employment, due process does not afford a right to public employment, but it does afford certain constitutional rights in relation to such employment. See McDowell v. Texas, 465 F.2d 1342, 1345-46 (5th Cir. 1971), cert. denied, 410 U.S. 943, 93 S.Ct. 1371, 35 L.Ed.2d 610 (1973). Among these rights is the right to procedural due process when charges are brought against an employee which might seriously damage standing and association in the community or impose a stigma or other disability that forecloses the freedom of the employee to take advantage of other employment opportunities. Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548, 558-59 (1972).
It is necessary for us to examine the facts presented to the trial court in order to determine whether a constitutionally protected liberty interest was violated by Anderson's termination. When a violation of constitutional rights is alleged we review the facts de novo to make an evaluation of the totality of the circumstances under which the trial court's ruling on those constitutional rights was made. State v. Cullison, 227 N.W.2d 121, 126 (Iowa 1975).
It was agreed below that Anderson was an employee at will and had no statutory or contractual rights to due process. She was terminated summarily by Schott, her immediate supervisor, and was given a letter containing five reasons for her discharge, to-wit:
1. You have antagonized personnel in the Community Development Department and are a constant source of friction within the Department.
2. You have antagonized personnel in other departments in City Hall, creating animosities between City employees.
3. You have exceeded your position as Urban Renewal Secretary by directly intervening in matters beyond your authority.
*244 4. I have received repeated criticisms from other City employees, Department Heads, City Council members, and members of City Commissions regarding your behavior.
5. You have lost my confidence, respect, and trust in your ability to function as Urban Renewal Secretary. As such, the working relationship essential to the efficient operation of the Department is gone. There is no way this situation can continue.
Several of these reasons were published by the news media. Whether Anderson, Schott, or someone else released the text of the letter is unclear from the controverted evidence in the record. Schott did discuss Anderson's termination with representatives of the news media, however, stating that there were five reasons for Anderson's dismissal, that it was precipitated by no one thing but by an accumulation of activities he could no longer tolerate, and that it was the action he felt could best remedy the difficulty caused by friction between employees in the department.
Anderson claims that under Roth a discharged governmental employee who receives adverse publicity imposing a stigma that forecloses other employment opportunities should have an opportunity to refute the charges giving rise to the stigma. While we agree with this position, the nature of the charges here do not meet Roth's definition of stigma.
In Roth a first-year university professor, who was under a one-year contract, was not rehired. Roth sued alleging that the university's reason for not renewing his contract was to punish him for making statements criticizing the university administration. The United States Supreme Court rejected Roth's claim that the university's failure to provide him with a statement of reasons for nonretention and an opportunity for a hearing violated a constitutionally protected liberty interest. In so doing the Court said that the state did not charge Roth with anything that might seriously damage his standing or associations in the community in that he was not charged with dishonesty or immorality, and there was no suggestion that his good name, reputation, honor, or integrity was at stake. Board of Regents v. Roth, 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558-59.
Other courts have held that accusations of incompetence, insubordination, hostility to authority, and unprofessional or unethical conduct do not violate a constitutionally protected liberty interest. See, e. g., Norbeck v. Davenport Community School District, 545 F.2d 63, 69 (8th Cir. 1976), cert. denied, 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977) (employee charged with poor judgment and conduct failing to meet professional standards); Stretten v. Wadsworth Veterans Hospital, 537 F.2d 361, 366, (9th Cir. 1976) (pathology resident charged with incompetence and inability to get along with coworkers); Gray v. Union County Intermediate Education District, 520 F.2d 803, 806 (9th Cir. 1975) (teacher terminated for student and parent problems, undermining community social agencies, insubordination, incompetence, hostility toward authority, and aggressive behavior); Brouillette v. Board of Directors of Merged Area IX, 519 F.2d 126, 127-28 (8th Cir. 1975) (teacher charged with tardiness and inability to maintain order); State ex rel. Trimble v. State Board of Cosmetology, 50 Ohio St.2d 283, 286-87, 364 N.E.2d 247, 250 (1977) (charge of unprofessional, unethical, and insubordinate conduct on single occasion).
While the liberty interest protected by the fourteenth amendment is the right to be free to move about and live and practice one's profession "without the burden of an unjustified label of infamy," Stretten v. Wadsworth Veterans Hospital, 537 F.2d at 366, "[p]ersonality differences or difficulty in getting along with others are simply not the kinds of accusations which warrant a hearing, as contemplated by Roth." Gray v. Union County Intermediate Education District, 520 F.2d at 806. To violate the constitutionally protected liberty interest the accusations must be of grave consequence. They must involve allegations of dishonesty, immoral, or illegal *245 conduct that call into question the terminated employee's honesty, reputation, or good name. Connealy v. Walsh, 412 F.Supp. 146, 159 (W.D.Mo.1976). Basically, Anderson was accused of inability to get along with others, insubordination, and generally being a trouble maker. There was no imputation of dishonesty, immorality, or illegality implicating Anderson's honesty, reputation, or good name.
We hold that the trial court was correct in dismissing Anderson's wrongful termination claim. Anderson's termination, together with its accompanying publicity, did not violate a liberty interest protected by the fourteenth amendment. Accordingly, she was not entitled to a due process hearing.
Our holding renders it unnecessary for us to entertain Anderson's contention that she was not accorded due process at the hearing she received.
III. Libel. Anderson maintains that on or about October 20, 1975, approximately four months prior to her discharge, she was libeled by a written statement released by Six to Rod Neaville, a newsman, and by LHA releasing the same statement to Robert Campagna and his attorney. The offending statement submitted to the jury by the court was: "She [Anderson] also has become a serious source of difficulty for the LHA." The jury determined that the statement was libelous and awarded damages in favor of Anderson against LHA in the amount of $15,000 and against Six in the amount of $20,000.
The trial court adopted part but not all of the standards prescribed by the United States Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In New York Times the Court held that the provisions of the first amendment apply to the states through the due process clause of the fourteenth amendment, and, consequently, state laws must require clear and convincing evidence of actual malice when a public official or public figure sues a media defendant for libel. Id. at 276-77, 283-86, 84 S.Ct. at 724, 727-29, 11 L.Ed.2d at 704, 708-10.
The trial court found Anderson to be a public figure. It therefore instructed the jury that Anderson was required to prove that the allegedly libelous statement was published by Six and LHA with knowledge that the statement was false or with reckless disregard as to whether or not the statement was true or false. Because Six and LHA were nonmedia defendants, however, the trial court instructed the jury that such malice only had to be proved by a preponderance of the evidence.
Six preserved error by objecting that the quantum of proof required by New York Times is clear and convincing evidence. Anderson maintains that the trial court erred in finding her to be a public figure and, consequently, in requiring her to prove malice under the New York Times standard. If Anderson's contention that she was not a public figure is correct, the instruction requiring Anderson to prove libel by a preponderance of the evidence is correct, and the fact that she was incorrectly required to prove malice, an element of proof not required in an action brought by a private individual, is immaterial.
To determine whether there was sufficient evidence to sustain the trial court's finding that Anderson was a public figure, it is necessary to define that term. In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court stated that there are two types of public figures. First, there are individuals who through fame and notoriety are public figures for all purposes. Secondly, and more commonly, there are individuals who inject themselves or are drawn into a particular public controversy and thereby become public figures for a limited range of issues. "[S]uch persons assume special prominence in the resolution of public questions." Id. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. "In either event, they invite attention and comment." Id. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. The Gertz Court reasoned that public figures are not entitled to the same protection of their reputations as private parties because public figures have access to channels of effective communication, have a reasonable opportunity *246 to counteract false statements, and are not as vulnerable to injury as private individuals.
In determining that Anderson was a public figure the trial court stated:
The Court has, as I have advised you, although I am not sure it has been made a record in this case prior to this time, concluded that the Plaintiff is a public figure. That conclusion is made upon the record as a whole, which discloses to the Court that Mrs. Anderson voluntarily injected herself into the issues then swerling [sic] in City government in the City of Muscatine. More particularly, the investigations that were going on in the Low Rent Housing and Urban Development departments. That she contacted candidates for public office, including Council and Mayor, and gave them counsel and advice and passed along information involving not only those issues, but apparently other issues as well. That she, in her pleading, identifies herself the major contact for the investigators and auditors who were examining the Urban Renewal program, and specifically the relocation records. That the issue involved was a matter of public interest as opposed to privately newsworthy, as was the case in the Firestone versus Time matter, where the alleged defamation grew out of the grounds for divorce between a prominent man and wife. But because the plaintiff here is, for the purposes of this trial, a public individual, it is the Court's view of the law that even though the Defendant is a non-media defendant as was raised by Plaintiff, nevertheless, the standard in the case of libel involves malice.
Anderson does not challenge the propriety of the trial court's making the "public figure" determination. However, she maintains that the trial court erred in ruling that she was a public figure on October 20, 1975, the date the alleged libelous statement was released by Six and LHA. Even though this is a law action our standard of review is de novo to ascertain whether the evidence supports the trial court's "public figure" finding, which is a question of "constitutional fact." See New York Times Co. v. Sullivan, 376 U.S. at 284-85, 84 S.Ct. at 728-29, 11 L.Ed.2d at 709.
There is ample evidence in the record to substantiate the trial court's finding that Anderson had thrust herself into the issues then swirling in city government. She invited attention and influenced that controversy. Anderson herself admitted she had called a reporter concerning an FBI and HUD investigation three or four times during a period commencing in October.
Other events occurred prior to October 20 that are of a similar nature. News stories attached to her pleadings indicate that Anderson was a major contact for investigators and auditors examining Urban Renewal and relocation records. She was quoted as saying that her problems started the summer before she was discharged when she endeavored to correct problems and reported people who she felt were not doing their jobs properly. She told fellow employees that she had called the FBI and complained about certain individuals. One coworker described how she "unloaded" on an unknown man who visited city hall, telling him that nobody in municipal government was honest.
Newsman Knaapen stated she complained to him about Rod Parsons, her supervisor until he was terminated in November 1975, and reported to him concerning investigators and allegations. Newsman Neaville said Anderson told him things were amiss and made accusations, invited him to look into files, and called him at home about the FBI investigating city hall. Neaville testified that on October 19 he knew she was a trouble maker and an incredible news source. He also stated Anderson used the media "to get her points across." Newsman Martin testified that Anderson told him things were wrong in city hall, the city was being investigated by HUD and the FBI, and Parsons was having problems with the city administrator. Evelyn Schauland, who was then a candidate for mayor, testified that she received anonymous phone calls in August 1975 about *247 "crooks" and "dishonest people" and the FBI being called in. Upon receiving subsequent phone calls Schauland demanded to know who her caller was and learned that it was Anderson. Parsons, in a conversation with Six, described Anderson as being a member of the "gestapo." He also stated that Anderson could not keep her mouth shut, and, because of her, city business was all over town. From the foregoing we conclude that Anderson injected herself into issues of public interest involving the city and became a public figure for the purpose of the controversy surrounding those issues.
The trial court, although it adopted the New York Times standard of malice, refused to apply its clear and convincing evidence standard of proof. The court reasoned that the clear and convincing evidence standard was necessary in New York Times to promote and protect media discussion, but since the defendants in the present case were not members of the media they were not entitled to the same protection under the first amendment. Anderson defends this ruling by arguing that freedom of speech and freedom of the press are not synonymous, and that the issue of whether the New York Times standard applies to nonmedia defendants is still an open question.
Subsequent to the trial in this case, however, we decided Blessum v. Howard County Board of Supervisors, 295 N.W.2d 836 (Iowa 1980). In Blessum a county engineer sued the board of supervisors for defamation. We applied the New York Times actual malice standard, stating: "Clear and convincing proof of knowledge of falsity or reckless disregard for the truth must be shown." Id. at 843. Other state courts have also applied the New York Times standard without differentiating between media and nonmedia defendants. See Grad v. Copeland, 280 So.2d 461, 462 (Fla.Dist.Ct. App.), cert. denied, 287 So.2d 682 (Fla.1973); Gibson v. Maloney, 263 So.2d 632, 636 (Fla. Dist.Ct.App.), cert. denied, 268 So.2d 909 (Fla.1972), cert. denied, 410 U.S. 984, 93 S.Ct. 1505, 36 L.Ed.2d 180 (1973); Hirman v. Rogers, 257 N.W.2d 563, 566 (Minn.1977); Wollman v. Graff, 287 N.W.2d 104, 107 (S.D.1980). And we find no basis in the plain language of the first amendment that would justify according greater protection to the media than to private parties, such as Six and LHA.[1]
We therefore hold that the New York Times standard requiring malice to be established by clear and convincing evidence applies to both media and nonmedia defendants in an action for libel. Since the trial court erred in failing to so instruct the jury, we reverse and remand for a new trial on the libel claim.
IV. Invasion of privacy. Late in the afternoon on February 17, 1976, Schott gave Anderson written notice of the termination of her employment. (This notice is set out in part in division II of this opinion.) Schott had a meeting with a citizens advisory group that evening. After the meeting two media reporters confronted Schott and asked him to confirm Anderson's termination. Schott told them that he had given Anderson a letter of termination containing five reasons for her discharge. The next morning a local radio station aired a news story on Anderson's termination stating that although Schott would not make public the specific reasons for her dismissal it was precipitated by no one thing but by an accumulation of activities he could no longer tolerate. Schott was quoted to the effect that he had been plagued with two problems: one involved various investigations, and the other concerned friction between employees in the community development department. Schott was also quoted as saying that the dismissal of Anderson was the action he felt could best remedy that difficulty. Schott admitted that the news story was an accurate account of what he had told the reporter. The other reporter stated that Schott said: "The purpose of the dismissal was to get the community *248 development department back to working efficiently and effectively."
Anderson testified that she did not release information to the news media until after she heard the radio broadcast concerning her dismissal. She then admittedly went to local radio stations and the newspaper and provided them with rebuttal information. Some of the material contained in Anderson's termination notice was subsequently publicized by the news media, but it is unclear who disclosed this information to them.
The statement of issues submitted to the jury by the trial court limited Anderson's invasion of privacy claim to the allegation that on February 17, 1976, the date of her discharge, defendant Schott communicated untruthful information about her termination to the news media. The court instructed the jury that Anderson had the burden of proving that Schott made a statement or statements concerning Anderson, that one or more of such statements were false in some material respect, that Schott gave publicity to such statement or statements, that such statement or statements placed Anderson in a false light which would be highly offensive to a reasonable person, and that Schott performed such acts with knowledge of the falsity of the statement or statements or with reckless disregard as to their falsity and the false light in which Anderson would be placed. The jury was also instructed that truth was a defense. The jury returned verdicts for actual damages of $10,000 and punitive damages of $10,000 against Schott in favor of Anderson.
Schott claims the trial court erred in refusing to instruct the jury on two affirmative defenses: waiver of the right of privacy and consent to public disclosure. Schott has not challenged the sufficiency of the evidence to support the jury's verdict, the trial court's instruction on quantum of proof, or the content of instructions on the definition and elements of invasion of privacy.
We will limit our review to those issues presented and argued by the parties. See Zeman v. Canton State Bank, 211 N.W.2d 346, 350 (Iowa 1973). It will be necessary, however, to review briefly the tort of invasion of privacy to determine whether instructions on the affirmative defenses of waiver and consent should have been submitted to the jury.
We have long recognized the common-law tort of invasion of privacy, and we have adopted the principles of Restatement (Second) of Torts § 652A (1977). See Howard v. Des Moines Register and Tribune Co., 283 N.W.2d 289, 291 (Iowa 1979), cert. denied, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980); Winegard v. Larsen, 260 N.W.2d 816, 822 (Iowa 1977); Bremmer v. Journal-Tribune Publishing Co., 247 Iowa 817, 821-22, 76 N.W.2d 762, 764-65 (1956). An invasion of privacy action may be based on any of four distinct wrongs: "(a) unreasonable intrusion upon the seclusion of another,. . . or (b) appropriation of the other's name or likeness, . . . or (c) unreasonable publicity given to the other's private life, . . . or (d) publicity that unreasonably places the other in a false light before the public ...." Restatement (Second) of Torts § 652A (1977). Anderson's claim was presented to the jury on the "false light" theory of invasion of privacy. See id. § 652A(d).
The "false light" variety of invasion of privacy is predicated upon an untruthful publication which places a person before the public in a manner that would be highly offensive to a reasonable person. Id. § 652E. The essential element of untruthfulness differentiates "false light" from the other forms of invasion of privacy and many times affords an alternate remedy for defamation even though it is not necessary for a plaintiff to prove that he or she was defamed. Id. comments a-b.
The trial court placed the burden on Anderson to prove malice by showing that Schott either knew the allegedly offensive published statements were false or made the statements with reckless disregard as to the falsity of the matters asserted and the false light in which Anderson would be placed. This is consistent with the line of *249 defamation cases commencing with New York Times v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964), wherein a majority of the United States Supreme Court held that a public official had to prove actual malice in a defamation action. In 1967, in Curtis Publishing Co. v. Butts, 388 U.S. 130, 162-65, 170, 172-74, 87 S.Ct. 1975, 1995-97, 1999, 2000-01, 18 L.Ed.2d 1094, 1115-17, 1120, 1121-22 (1967) (plurality opinion), the requirement of proof of malice was extended to defamation actions by public figures. The same year the actual malice requirement was also extended to invasion of privacy suits based on a "false light" claim in Time, Inc. v. Hill, 385 U.S. 374, 387-91, 87 S.Ct. 534, 542-44, 17 L.Ed.2d 456, 466-69 (1967). The Hill Court stated that the first amendment protects publications involving matters of "public interest." Id. at 387-91, 87 S.Ct. at 542-44, 17 L.Ed.2d at 466-69.
Here the jury by its verdicts found that false statements by Schott had been published placing Anderson in a false light that would be highly offensive to a reasonable person, and that such statements were made with knowledge of or reckless disregard for the falsity of the matters asserted and the false light in which Anderson would be placed. Schott asks us to overturn the jury verdicts because the trial court refused to instruct the jury on the affirmative defenses of consent and waiver.
Parties to a lawsuit have a right to have their legal theories submitted to the jury as long as they are supported by the pleadings and substantial evidence. Lockard v. Carson, 287 N.W.2d 871, 875 (Iowa 1980). Even when the evidence is not in dispute, it is viewed in the light most favorable to the party requesting the instruction, and if reasonable minds might draw different inferences from the evidence a jury question is engendered. See Oak Leaf Country Club, Inc. v. Wilson, 257 N.W.2d 739, 744 (Iowa 1977). Schott pleaded both affirmative defenses. We must therefore determine whether substantial evidence existed to engender a jury question on the defenses.
A. Waiver. Schott, in objecting to the trial court's failure to instruct the jury on the affirmative defense of waiver, called the court's attention to evidence that prior to her termination Anderson told a newspaper reporter that her job was in jeopardy. Schott also relied on evidence that Anderson had made a public statement at a city council meeting concerning a drainage problem that her in-laws had with the City, and that she made public utterances after February 17, 1976, concerning her termination. In overruling Schott's subsequent motion for a new trial the trial court stated that the record disclosed no waiver of a right to privacy.
There is evidence that Anderson had stated her job was in jeopardy, and that the newspapers had on several occasions mentioned she was a secretary for LHA. There is also substantial evidence that Anderson injected herself into public controversy and had become newsworthy. To determine whether these incidents constitute substantial evidence that Anderson waived her "false light" invasion of privacy claim, it is necessary to examine the waiver of privacy defense.
The right of privacy may be lost by express or implied waiver by the complaining party. See 62 Am.Jur.2d Privacy § 18, at 703 (1972). Waiver is generally defined as the voluntary and intentional relinquishment of a known right. Williams v. Stroh Plumbing & Electric, Inc., 250 Iowa 599, 602, 94 N.W.2d 750, 753 (1959). For implied waiver to exist, the intention of the party alleged to have waived his or her rights must be clear from the party's conduct. Id. at 602, 94 N.W.2d at 753. Normally the question of waiver is one for the jury; however, where the evidence is not in dispute, the question becomes one of law for the court. Id. at 602-03, 94 N.W.2d at 753.
The evidence upon which Schott relies to establish waiver falls into two basic categories: (1) public utterancesAnderson's statement to the media that her job was in jeopardy, statements in behalf of her in-laws at a council meeting, and information *250 disclosed to the media concerning her termination; and (2) voluntary newsworthinessher name appearing in print by virtue of her employment and the fact that she injected herself into a public controversy. We will examine these classifications individually to determine whether either or both present substantial evidence that Anderson waived her right of privacy.
As already noted, to establish her "false light" invasion of privacy claim Anderson was required to prove that Schott caused untruthful statements to be published which placed her in a false light that would be highly offensive to a reasonable person. The statement that Anderson had been terminated was obviously truthful. Therefore, the jury had to have found one or more of the representations concerning the reasons for her discharge untruthful.
Anderson's public utterances do not constitute either express or implied waiver. The fact that an employee discloses to the press that her job is in jeopardy and makes statements supporting relatives on an issue involving her employer may constitute waiver of the employer's disclosure of truthful private matters in response to those statements, but it does not evidence a voluntary, knowing, and intelligent submission to the employer's subsequent disclosure of false information. Similarly, an employee's statements to the media in response to a previous disclosure by her employer are not probative evidence of waiver. An after-the-fact refutation is a normal reaction when charges are levied against an individual. An effort to clear one's good name cannot, without more, be considered to constitute waiver.
Schott also contends Anderson waived her right of privacy by injecting herself into public controversy and becoming newsworthy. The defense of waiver is closely associated, and many times used interchangeably, with other defenses, such as consent, estoppel by becoming a public figure, being involved in a matter of public interest, doing an act which is a matter of public record, or merely being in a public place. See Annot., 57 A.L.R.3d 16, 33 (1974). See also Howard v. Des Moines Register and Tribune Co., 283 N.W.2d at 298 (no liability in invasion of privacy action for disclosures of matters of public record which are of legitimate public concern); Winegard v. Larsen, 260 N.W.2d at 821; Bremmer v. Journal-Tribune Publishing Co., 247 Iowa at 828, 76 N.W.2d at 768 (picture of kidnapped child's dead body is newsworthy and privileged from invasion of privacy suit).
Schott, in essence, is asking us to designate his defense of waiver as a defense of newsworthiness and recognize a privilege for newsworthiness in invasion of privacy suits. In Time, Inc. v. Hill, 385 U.S. at 387-91, 87 S.Ct. at 542-44, 17 L.Ed.2d at 466-69, first amendment protections were applied to matters of public interest in an invasion of privacy suit. Schott maintains that just because he disclosed to the public facts concerning Anderson's termination, which the jury found to be untrue and placed Anderson in a false light, he still was entitled to present his defense of waiver of right of privacy as Anderson voluntarily made a public issue out of her termination. We believe defendant Schott has missed the point. While it is true that Anderson's termination became a newsworthy event, the trial court recognized this and applied the New York Times and Hill requirement of proving actual malice.
The privilege of publishing matters of public interest and items concerning public figures does not extend to false statements; nor does it justify misleading publicity or misrepresentations. Bell v. Birmingham Broadcasting Co., 266 Ala. 266, 269, 96 So.2d 263, 266 (1957). Such falsity cannot be insulated from liability by the defense of waiver without some evidence of conduct clearly indicating that the plaintiff voluntarily and intentionally acquiesced in the falsity. The trial court was correct in determining that there was no such evidence, and it did not err by refusing to instruct on the affirmative defense of waiver.
B. Consent. Schott also claims the trial court erred in refusing to instruct the jury *251 on his affirmative defense of consent. In support of this contention Schott relies on evidence that following the February 18 airing of the news story on her termination Anderson went to a radio station and taped an interview and went to a newspaper and was photographed and interviewed. Schott also relies on a newsman's testimony that it was possible that Anderson showed him the termination letter she received. In addition, Schott calls our attention to the fact that Anderson's name appeared in the newspaper five or six times in the four-month period prior to her termination. Whether these facts constitute substantial evidence of consent requiring submission of the issue to the jury requires an examination of consent as a defense to invasion of privacy and the circumstances under which the defense is applicable.
"[C]onsent to any publication, either of matter that is personally defamatory or of matter that invades privacy, creates an absolute privilege so long as the publication does not exceed the scope of the consent." Restatement (Second) of Torts § 652F, comment b (1977). Consent may be obtained by words or conduct intended to demonstrate consent. Id. § 892, comments b-c; id. § 583, comment c. To be effective as a defense the defendant must have consented to the particular conduct at issue or to substantially similar conduct. Id. § 892A 2(b). The extent and content of the alleged consent must therefore be established with particularity. Once consent is established, it is a defense only if the scope of the consent has not been exceeded. 62 Am. Jur.2d Privacy § 19 (1972).
On the basis of both the prior publicity Anderson had received and her subsequent action of seeking media publicity to answer his charges, Schott asserts that Anderson consented to his statements concerning her termination. We fail to see where either of these events constitute words or conduct intended to demonstrate consent to false statements concerning her termination.
The fact that Anderson's name appeared in the newspaper prior to the claimed invasion indicates at most a willingness on her part to be involved in a newsworthy controversy. Indeed, on most of the occasions when Anderson's name appeared in the newspaper she was merely mentioned as a secretary for LHA. But in any event, agreement by conduct to have one's name publicized by the news media does not evince agreement to have false statements published about one's termination of employment.
The trial court carefully limited the invasion of privacy claim to February 17, 1976. Anderson's subsequent action of going to the media and responding to the reasons for her termination are actions in mitigation of damages rather than proof of consent to the prior publication of false statements about her termination.
We conclude that there was no substantial evidence of consent to an invasion of Anderson's privacy, and that the trial court's refusal to submit an instruction to the jury on the affirmative defense was correct.
V. Admissibility of exhibit. Anderson testified that the mayor had instructed her to type an affidavit that was signed by the former urban renewal director and the assistant urban renewal director. This affidavit indicated that certain construction plans were not submitted, reviewed, or approved. Anderson offered the exhibit into evidence for the limited purpose of showing that she performed work for the mayor, which the mayor did not remember.
Schott's attorney objected to the admission of the exhibit:
No proper foundation, Your Honor, it is hearsay. Mrs. Anderson is not the signatoree. It has no relevancy. The jury is going to get completely the wrong impression.... It hasn't got Mrs. Anderson's initials on it. Mrs. Anderson just testified herself that she typed it. I believe the introduction of the document will serve no other purpose. That will completely mislead the jury on what it is.
The trial court admitted the exhibit into evidence and gave the jury a limiting instruction:

*252 Ladies and Gentlemen of the Jury, the proffered exhibit is going to be allowed for the limited and sole purpose of evidence as to whether or not Mrs. Anderson did the typing for and at the request of Mayor Schauland, and you are admonished that the contents of the exhibit are of no evidentiary value as to any of the issues in this case and are not to be so considered by you.
Schott's initial objection was that there was no proper foundation for the document because Anderson had not signed it. An exhibit must be authenticated to be admissible. See In re Herron, 212 N.W.2d 474, 476 (Iowa 1973). We believe that there was sufficient authentication through Anderson's testimony, in which she identified the exhibit and testified that she had typed it. The rules governing the admission of written memoranda are procedural, and the trial court has considerable discretion in determining admissibility. Nadler v. Treptow, 166 N.W.2d 103, 105 (Iowa 1969). We find no abuse of that discretion.
Schott also objected to the exhibit on the basis that it was hearsay. The exhibit was offered for a limited purpose, however, and the jury was admonished that the contents of the exhibit were of no evidentiary value as to the issues in the case and were not to be considered as such. Hearsay is defined: "Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." McCormick on Evidence § 246, at 584 (2d ed. E. Cleary 1972). This evidence clearly was not offered to prove the truth of the contents of the exhibit and is not hearsay.
Finally, Schott raised the objection of relevancy. The basic test of relevancy is the question whether the challenged evidence makes the desired inference more probable than it would be without the evidence. Kalianov v. Darland, 252 N.W.2d 732, 735 (Iowa 1977). The evidence must be probative and tend to establish a material proposition. State v. Wilson, 173 N.W.2d 563, 565 (Iowa 1970). Here the evidence had probative value to show that Anderson typed for the mayor. A trial court has discretion to exclude evidence when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury. Carson v. Mulnix, 263 N.W.2d 701, 706 (Iowa 1978). Schott claims the city was put in an unfavorable light by the contents of the affidavit. However, he ignores the fact that the city was dismissed from the suit, and he also ignores the admonition by the court that the contents of the exhibit were not to be considered by the jury.
We thus hold that the admission of the exhibit was not error.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] U.S.Const. Amend. I provides in pertinent part: "Congress shall make no law . . . abridging the freedom of speech, or of the press."