**Michael S. VIRGIL, aka Mike Virgil, Plaintiff-Appellee,**

v.

**TIME, INC., a New York Corporation, Defendant-Appellant.**

No. 72–2851.

United States Court of Appeals, Ninth Circuit.

Dec. 5, 1975.

Harold R. Medina, Jr. (argued), Cravath, Swaine & Moore, New York City, for defendant-appellant.

Gerald R. Schmelzer, San Diego, Cal., for plaintiff-appellee.

## OPINION

Before MERRILL and CHOY, Circuit Judges, and EAST,* District Judge.

MERRILL, Circuit Judge:

This suit was brought in California state courts by appellee, Virgil, complaining of a violation of his right of privacy. It was removed to federal court by appellant, Time, Incorporated, on grounds of diversity. This interlocutory appeal, taken pursuant to 28 U.S.C. § 1292(b), is from an order of the district court denying the motion of appellant for a summary judgment.

The facts are stated by the district court in its memorandum decision as follows:

"The complaint is based upon an article that appeared in the February 22, 1971, issue of *Sports Illustrated* magazine [owned by appellant], entitled 'The Closest Thing to Being Born.' The article concerned the sport of body surfing as practiced at the 'Wedge,' a public beach near Newport Beach, California, reputed to be the world's most dangerous site for body surfing. The article attempted to describe and explore the character of the unique breed of man who enjoys meeting the extreme hazards of body surfing at the Wedge. Plaintiff is well known as a constant frequenter of the Wedge and is acknowledged by body surfers there to be the most daredevil of them all. He was extensively interviewed by Thomas Curry Kirkpatrick, the author of the article, and much of the information obtained from these interviews was used in the *Sports Illustrated* story. Photographs showing

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

plaintiff surfing and lying on the public beach were taken and used to illustrate the article.

Plaintiff admits that he willingly gave interviews to Kirkpatrick and that he knew that his name and activities as a body surfer might be used in connection with a forthcoming article in *Sports Illustrated.* But plaintiff now alleges that he 'revoked all consent' upon learning that the article was not confined solely to testimonials to his undoubted physical prowess.

The article complained of was written by Kirkpatrick, a *Sports Illustrated* staff writer. In the summer of 1969 he received authorization from the senior editor of the magazine to do a story about the Wedge and the men who surf there. He was supplied with names and information about prominent body surfers, including the plaintiff, by the Beverly Hills bureau of Time, Inc. He began researching the article that summer, and contacted many surfers at the Wedge. Through these sources Kirkpatrick heard about the plaintiff and his daredevil attitude toward body surfing and life in general. He returned to the Newport Beach area the following summer to complete his research. It was during this period that Kirkpatrick first met the plaintiff and conducted several interviews with him.

The photographs complained of were taken by a local freelance photographer who was commissioned by the defendants to photograph the Wedge and the body surfers. The photographer arranged, through one of the surfers, to have a group of surfers, including the plaintiff, come to the Wedge to have their pictures taken in connection with the article.

Before publication the Kirkpatrick article was checked and researched by another *Sports Illustrated* staff member. For that purpose the checker telephoned the plaintiff's home and verified some of the information with the plaintiff's wife. The checker also talked to the plaintiff concerning the article, at which point for the first time, the plaintiff indicated his desire not to be mentioned in the article at all, and that he wanted to stop the story. While not disputing the truth of the article or the accuracy of the statements about him which it contained, and while admitting that he had known that his picture was being taken, the plaintiff indicated that he thought the article was going to be limited to his prominence as a surfer at the Wedge, and that he did not know that it would contain references to some rather bizarre incidents in his life that were not directly related to surfing.

In spite of the plaintiff's expressed opposition to the article, the article was published following its approval by the editorial staff and legal counsel for Sports Illustrated. In its published form, the article is eleven pages long and contains approximately 7,000 words. The article refers by name to many people who surf at the Wedge, and concludes in the last two pages with an account of the plaintiff's daredevil feats at the Wedge and a series of anecdotes about him that emphasize the psychological characteristics which presumably explain the reckless disregard for his own safety which his surfing demonstrates.

Along with the photographs of the plaintiff, he complains of these references to incidents in his private, or non-surfing, life." [1]

1. E. g.: "He is somewhat of a mystery to most of the regular personnel, partly because he is quiet and withdrawn, usually absent from their get-togethers, and partly because he is considered to be somewhat abnormal."

"Virgil's carefree style at the Wedge appears to have emanated from some escapades in his younger days, such as the time at a party when a young lady approached him and asked where she might find an ashtray. 'Why, my dear, right here,' said Virgil, taking her lighted cigarette and extinguishing it in his mouth. He also won a small bet one time by burning a hole in a dollar bill that was resting on the back of his hand. In the process he also burned two holes in his wrist."

Respecting the applicable state law, the district court stated:

"California has adopted Dean Prosser's analysis of the tort of invasion of privacy. *Kapellas v. Kofman,* 1 C.3d 20, 35 n. 16, 459 P.2d 912, 81 Cal.Rptr. 360 (1969). According to that analysis, four separate torts are included within the broader designation of invasion of privacy.

1. *Intrusion* upon the plaintiff's seclusion or solitude, or into his private affairs;

2. Public *disclosure of embarrassing private facts* about the plaintiff;

3. Publicity which places the plaintiff in a *false light* in the public eye;

4. *Appropriation,* for the defendant's advantage, of plaintiff's name or likeness.

Prosser, Law of Torts (4th ed., 1971) 804–14. See also Prosser, *Privacy,* 48 Cal.L.Rev. 383, 389 (1960)." [2]

The district court concluded that of these four separate torts the one alleged by plaintiff was that of public disclosure of embarrassing private facts. We agree.[3]

The most recent definition of this tort and discussion of its elements is that to be found in The American Law Institute Restatement (Second) of Torts (Tentative Draft No. 21, 1975). Section 652D gives a new name to the tort, "Publicity Given to Private Life." The black letter reads:

"One who gives publicity to a matter concerning the private life of another is subject to liability to the other for unreasonable invasion of his priva-

---

The article quoted a statement Virgil made to the author about a trip to Mammoth Mountain: " 'I quit my job, left home and moved to Mammoth Mountain. At the ski lodge there one night I dove headfirst down a flight of stairs—just because. Because why? Well, there were these chicks all around. I thought it would be groovy. Was I drunk? I think I might have been.' "

The article quotes Virgil as saying: " 'Every summer I'd work construction and dive off billboards to hurt myself or drop loads of lumber on myself to collect unemployment compensation so I could surf at the Wedge. Would I fake injuries? No, I wouldn't fake them. I'd be damn injured. But I would recover. I guess I used to live a pretty reckless life. I think I might have been drunk most of the time.' "

Again quoting Virgil, the author relates: " 'I love tuna fish. Eat it all the time. I do what feels good. That's the way I live my life. If it makes me feel good, whether it's against the law or not, I do it. I'm not sure a lot of the things I've done weren't pure lunacy.' Cherilee [plaintiff's wife] says, 'Mike also eats spiders and other insects and things.' "

Virgil was further quoted as saying, " 'I've always been determined to find a sport I could be the best in. I was always aggressive as a kid. You know, competitive, mean. Real mean. I bit off the cheek of a Negro in a six-against-30 gang fight. They had tire irons with them. But that was a long time ago. At the Wedge, there are a lot of individualists.' "

The articles notes: "Perhaps because most of his time was spent engaged in such activity, Virgil never learned how to read."

A photo caption reads: "Mike Virgil, the wild man of the Wedge, thinks it possible his brain is being slowly destroyed."

2. Since *Kapellas v. Kofman, supra,* cited by the district court, California has decided *Briscoe v. Reader's Digest Association,* 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (1971), which deals with and recognizes the same tort as is involved here.

3. While the district court also determined that the "false light" theory applied, Virgil has expressly abandoned this theory on appeal. In the complaint appellee included other claims that can be regarded as dismissed from the case:

(A.) Intentional infliction of emotional distress. Under California law this is found only in cases of extreme or outrageous conduct, *State Rubbish Collectors Association v. Siliznoff,* 38 Cal.2d 330, 240 P.2d 282 (1952). Such conduct, apart from the invasion of privacy by the publication of private facts, is not present here, and the case is thus best treated on the basis of the publication tort only.

(B.) Intrusion into private areas. It is clear that Kirkpatrick did not intrude on appellee's solitude and that all interviews were freely given.

(C.) Libel. Virgil expressly denies that this is a libel action.

(D.) Publication of the photograph. Under California law one who voluntarily adopts a pose in public view waives any right of privacy in so far as that particular pose is concerned, *Gill v. Hearst Publishing Co.,* 40 Cal.2d 224, 253 P.2d 441 (1953).

**1126**

cy, if the matter publicized is of a kind which

(a) would be highly offensive to a reasonable person, and

(b) is not of legitimate concern to the public." [4]

With respect to "publicity" comment *b* reads in part: [5]

" 'Publicity,' as it is used in this Section, differs from 'publication,' as that term is used in § 577 in connection with liability for defamation. 'Publication,' in that sense, is a word of art, which includes any communication by the defendant to a third person. 'Publicity,' on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written, or by any other means. It is one of communication which reaches, or is sure to reach, the public.

Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person, or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication."

With respect to "private life," comment *c* reads in part:

"The rule stated in this Section applies only to publicity given to matters concerning the private, as distinguished from the public, life of the individual. There is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public. * *

Likewise there is no liability for giving further publicity to what the plaintiff himself leaves open to the public eye."

It is argued that by voluntary disclosure of the facts to Kirkpatrick, knowing that he proposed to write an article including information about appellant, appellant had himself rendered public the facts disclosed. We cannot agree.

■ It is not the manner in which information has been obtained that determines whether it is public or private. Here it is undisputed that the information was obtained without commission of a tort and in a manner wholly unobjectionable. However, that is not determinative as to this particular tort. The offense with which we are here involved is not the intrusion by means of which information is obtained (see note 3(B), *supra*); it is the publicizing of that which is private in character. The question, then, is whether the information disclosed was public rather than private—whether it was generally known and, if not, whether the disclosure by appellant can be said to have been to the public at large.

---

**4.** In so far as the elements of the tort are concerned, the Restatement fairly comports with the requirements established by California law, *see Briscoe v..Reader's Digest Association*, 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (1971), *Kapellas v. Kofman*, 1 Cal.3d 20, 34–39, 81 Cal.Rptr. 360, 369–72, 459 P.2d 912, 921–24 (1969).

**5.** Section 652D is set out in the Restatement (Second) of Torts (Tentative Draft No. 21,

1975) without comment. The comments to § 652D cited in the text are found in Restatement (Second) of Torts (Tentative Draft No. 13, 1967). The changes made to § 652D by Tentative Draft No. 21 do not appear to affect the validity of any of these comments, nor is any indication given in the preliminary note to Tentative Draft No. 21, pp. 86–87, that the previously published comments are no longer applicable.

■ Talking freely to someone is not in itself, under comment *c*, making public the substance of the talk. There is an obvious and substantial difference between the disclosure of private facts to an individual—a disclosure that is selective and based on a judgment as to whether knowledge by that person would be felt to be objectionable—and the disclosure of the same facts to the public at large. The former, as the Restatement recognizes, does not constitute publicizing or public communication (see comment *b* as quoted *supra*) and according does not destroy the private character of the facts disclosed. *See Timperley v. Chase Collection Service,* 272 Cal. App.2d 697, 700, 77 Cal.Rptr. 782, 784 (1969); *Schwartz v. Thiele,* 242 Cal. App.2d 799, 805, 51 Cal.Rptr. 767, 770–71 (1966).

■ Talking freely to a member of the press, knowing the listener to be a member of the press, is not then in itself making public. Such communication can be said to anticipate that what is said will be made public since making public is the function of the press, and accordingly such communication can be construed as a consent to publicize. Thus if publicity results it can be said to have been consented to. However, if consent is withdrawn prior to the act of publicizing, the consequent publicity is without consent.[6]

■ We conclude that the voluntary disclosure to Kirkpatrick did not in itself constitute a making public of the facts disclosed.

■ Appellant contends that since Virgil has not denied the truth of the statements made in the article, the publication was privileged under the First Amendment. The law has not yet gone so far.

The most recent Supreme Court expression on the subject, *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), dealt with the same tort as is involved here, characterized by the Court as "the right [of one] to be free from unwanted publicity about his private affairs, which, although wholly true, would be offensive to a person of ordinary sensibilities." *Id.* at 489, 95 S.Ct. at 1043. The Court noted:

> " * * * the appellants urge upon us the broad holding that the press may not be made criminally or civilly liable for publishing information that is neither false nor misleading but absolutely accurate, however damaging it may be to the reputation or individual sensibilities."

*Id.* The Court refused to reach this broad question "whether truthful publications may ever be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments * * *." *Id.* at 491, 95 S.Ct. at 1044. It chose instead to deal with a "narrower interface between press and privacy," *id.,* focusing on the protectable area of privacy and excluding from it material to be found in judicial records open to inspection by the public.

The Supreme Court, then, has not held in accordance with the contentions of appellant. Instead it has expressly declined to reach the issue presented. That issue seems to us to be whether, despite California's recognition and the recognition elsewhere given, this tortious violation of privacy is, as a tort to be written out of the law. It seems to us to contemplate the further question whether the private individual is hereafter to be able to enjoy a private life save with leave of the press; whether (at least so far as the press is concerned) the

---

**6.** *See* Restatement (Second) of Torts § 892A(5) (Tentative Draft No. 18, 1972); *State ex rel. La Follette v. Hinkle,* 131 Wash. 86, 229 P. 317 (1924); Prosser, *Privacy,* 48 Cal.L.Rev. 383, 420 (1960). There may be cases where requir- ing that an eleventh-hour change of mind be honored would unfairly burden the publisher and where it could not, for that reason, be regarded as a timely revocation of consent. This is not such a case.

concept of "private facts" continues to have meaning.[7]

To hold that privilege extends to all true statements would seem to deny the existence of "private" facts, for if facts be facts—that is, if they be true—they would not (at least to the press) be private, and the press would be free to publicize them to the extent it sees fit. The extent to which areas of privacy continue to exist, then, would appear to be based not on rights bestowed by law but on the taste and discretion of the press. We cannot accept this result.

■ To test the validity of such a rule we might start with the public's right to know under the First Amendment. Does the spirit of the Bill of Rights require that individuals be free to pry into the unnewsworthy private affairs of their fellowmen? In our view it does not. In our view fairly defined areas of privacy must have the protection of law if the quality of life is to continue to be reasonably acceptable.[8] The public's right to know is, then, subject to reasonable limitations so far as concerns the private facts of its individual members.

■ If the public has no right to know, can it yet be said that the press has a constitutional right to inquire and to inform? In our view it cannot. It is because the public has a right to know that the press has a function to inquire and to inform.[9] The press, then, cannot be said to have any right to give information greater than the extent to which the public is entitled to have information.

■ We conclude that unless it be privileged as newsworthy (a subject we discuss next), the publicizing of private facts is not protected by the First Amendment.

The privilege to publicize newsworthy matters is included in the definition of

---

**7.** In this respect we note that privacy is not only a personal interest, but is also one of concern to society as a whole, *Rosenblatt v. Baer,* 383 U.S. 75, 92–94, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring).

**8.** *Afro-American Publishing Co. v. Jaffe,* 125 U.S.App.D.C. 70, 366 F.2d 649, 654 (1966) (en banc) similarly refused to allow First Amendment values to completely override actions for invasions of privacy: "The right of privacy stands on high ground, cognate to the values and concerns protected by constitutional guarantees. But this must be accommodated to the need for reasonable latitude for the selection of topics for discussion in newspapers. That right of the press, likewise supported by constitutional guarantees, is crucial to the vitality of democracy. The courts are called upon here, as elsewhere in the law, to harmonize individual rights and community interests." (footnote omitted.)

Recent decisions of the Supreme Court, we feel, also strengthen our conclusion. These decisions serve to emphasize that First Amendment interests may be circumscribed due to competing values which are also of substantial importance to society. *U. S. Civil Service Commission v. Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). More particularly, *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) acknowledged the need to recognize the strength of legitimate state interests in protecting the well-being of its citizens, even in the face of a broad First Amendment challenge. The state's interest in protecting the privacy of its citizens seems to us no less legitimate than the state's interest, upheld in *Gertz,* in protecting its citizens' reputations. Indeed, privacy shares the same underlying purpose invoked by the Court in *Gertz* in upholding the state's interest in the law of libel; for privacy, no less than reputation,

"'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual states under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.' *Rosenblatt v. Baer,* 383 U.S. 75, 92, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) (concurring opinion)," cited in *Gertz v. Robert Welch, Inc., supra* at 341, 94 S.Ct. at 3008.

**9.** *See Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 122, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), indicating that the foremost First Amendment concern is the interest of the public; *see also Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

the tort set out in Restatement (Second) of Torts § 652D (Tentative Draft No. 21, 1975). Liability may be imposed for an invasion of privacy only if "the matter publicized is of a kind which * * * is not of legitimate concern to the public." While the Restatement does not so emphasize, we are satisfied that this provision is one of constitutional dimension delimiting the scope of the tort and that the extent of the privilege thus is controlled by federal rather than state law.

Restatement comment casts light on the nature of matter that "is not of legitimate concern to the public." The privilege extends to "voluntary public figures," comment c,[10] and to some "involuntary public figures" (those "who have not sought publicity or consented to it, but through their own conduct or otherwise have * * * become 'news,'") comment d. It extends to "all matters of the kind customarily regarded as 'news,'" comment e; and also "giving information to the public for purposes of education, amusement or enlightenment, where the public may reasonably be expected to have a legitimate interest in what is published," comment h.

That this privilege extends to private facts is made clear by comment f. It is emphasized, however, that the privilege is not unlimited. The comment states:

"In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern. * * * *"

In our judgment such a standard for newsworthiness does not offend the First Amendment; by the extreme limits it imposes in defining the tort[11] it avoids unduly limiting the breathing space needed by the press for the exercise of effective editorial judgment. *See Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). The definition of the "line to be drawn" is not as clear as one would wish, but it expresses the distinction between that which is of legitimate public interest and that which is not as well as we could do.[12] Where competing values are involved (see note 8), unless one competitor is to be sacrificed outright, those involved with the competition must accept that risks are inherent and the problem lies in attempting to minimize

10. Comment c, as well as the other comments cited or referred to in the text, is taken from the comments to Restatement (Second) of Torts § 652F (Tentative Draft No. 13, 1967). That section, which spoke of the privilege to publicize matters of public interest, has now been eliminated; the provision of § 652F pertinent to the tort involved here has now been directly incorporated within § 652D by Restatement (Second) of Torts (Tentative Draft No. 21, 1975). The preliminary note to Tentative Draft No. 21, p. 86, indicates that the purpose of this change was to treat the element of "legitimate concern to the public" as a restriction on the cause of action rather than as a privilege; nothing is said to indicate that a substantive change with respect to any matter in the comments is intended. Accordingly, we shall treat the comments to the now eliminated § 652F as applicable to § 652D as it presently exists.

11. We do not intend that "morbid and sensational" be taken too literally. This language is not, in our view, to be regarded as a statement of a prerequisite, but rather as illustrative of the degree of offensiveness which should be present.

12. The fact that the standard is made to depend on community mores does not, to us, make it constitutionally infirm. Community standards play a role of constitutional dimension in other areas of free speech—*e. g.,* as to the obscene nature of a publication, *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). While determinations regarding community standards are subject to close judicial scrutiny, *Jenkins v. Georgia,* 418 U.S. 153, 160–61, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974), they nonetheless are essential in the resolution of free speech questions which are predicated on community values.

them to the extent that the conflict permits. In our view this the Restatement has done. Accordingly we accept the Restatement's standard for newsworthiness.

We move, then, to the question whether, with such a standard to be applied, the district court correctly ruled that factual issues remained to be resolved on trial. Here appellant makes a vigorous attack upon the order appealed from. Appellant contends: "A press which must depend upon a governmental determination as to what facts are of 'public interest' in order to avoid liability for their truthful publication is not free at all. * * * [However,] protection of the editor's discretion need not result in a rule which abdicates all responsibility to the press. A constitutional rule can be fashioned which protects all the interests involved. This goal is achieved by providing a privilege for truthful publications which is defeasible only when the court concludes as a matter of law that the truthful publication complained of constitutes a clear abuse of the editor's constitutional discretion to publish and discuss subjects and facts which in his judgment are matters of public interest."

We cannot agree that the First Amendment requires that the question must be confined to one of law to be decided by the judge. Courts have not yet gone so far in other areas of the law involving First Amendment problems, such as libel and obscenity. The testing of facts against a standard founded on community mores does entail judgment of the court itself. But if there is room for differing views as to the state of community mores or the manner in which it would operate upon the facts in question, there is room for the jury func-

tion. The function of the court is to ascertain whether a jury question is presented.[13]

This court, in *Guam Federation of Teachers, Local 1581, A. F. T. v. Ysrael,* 492 F.2d 438, 441 (9th Cir. 1974), *cert. denied* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974), stated:

"We agree * * * that it is important that judges focus attention on the summary judgment, directed verdict and judgment notwithstanding the verdict procedures in libel actions. When civil cases may have a chilling effect on First Amendment rights, special care is appropriate. Thus, a judicial examination at these stages of the proceeding, closely scrutinizing the evidence to determine whether the case should be terminated in a defendant's favor, provides a buffer against possible First Amendment interferences. The Supreme Court has instructed trial courts to 'examine for [themselves] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect.' * * *

\* \* \* \* \* \*

The *standard* against which the evidence must be examined is that of *New York Times* and its progeny. But the *manner* in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury. If the evidence, so considered, measures up to the *New York Times* standard, the case is one for the jury, and it is error to grant a directed verdict, as the trial judge did in this case."

---

**13.** The determination whether a matter is of public interest thus differs from the determination whether an individual is a public official or figure, which at least in the first instance is a matter for the trial judge, *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). The rationale advanced for this latter approach is to lessen the possibility that jury will use the general verdict as a cloak to punish unpopular ideas or speakers, *id.* at 88 n.

15, 86 S.Ct. 669, *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 276–77, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971). While this danger is also present in the area of privacy we believe that a determination founded on community mores must be largely resolved by a jury subject to close judicial scrutiny to ensure that the jury resolutions comport with First Amendment principles, *New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

*See also: Alioto v. Cowles Communications, Inc.,* 519 F.2d 777 (9th Cir. 1975), *cert. denied* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975).

The final question, then, is whether in application of the standard for newsworthiness taken from the Restatement, jury questions are presented.

We may concede, arguendo, that the privilege to publicize newsworthy matter would, as matter of law, extend to the general subject of the article here in question: body surfing at the Wedge. While not hot news of the day, this subject quite properly can be regarded as of general public interest.

■ However, accepting that it is, as matter of law, in the public interest to know about some area of activity, it does not necessarily follow that it is in the public interest to know private facts about the persons who engage in that activity. The fact that they engage in an activity in which the public can be said to have a general interest does not render every aspect of their lives subject to public disclosure. Most persons are connected with some activity, vocational or avocational, as to which the public can be said as matter of law to have a legitimate interest or curiosity. To hold as matter of law that private facts as to such persons are also within the area of legitimate public interest could indirectly expose everyone's private life to public view. Limitations, then, remain to be imposed and at this point factual questions are presented respecting the state of community mores.

■ Among the questions so presented here are: Whether (and, if so, to

what extent), private facts respecting Virgil, as a prominent member of the group engaging in body surfing at the Wedge, are matters in which the public has a legitimate interest; whether the identity of Virgil as the one to whom such facts apply is matter in which the public has a legitimate interest.[14] (Additional questions, related not to privilege but to other elements of the tort are: whether, for reasons other than the voluntary and knowing communication to Kirkpatrick, the facts had become matter of public knowledge; if not, whether the publicizing of these facts would prove highly offensive to a reasonable person—one of ordinary sensibilities.)

On these questions the function of the court on motion for summary judgment is to decide whether, on the record, reasonable minds could differ. If in the judgment of the court reasonable minds could not differ, and the answer on which reasonable minds agree favors invocation of the privilege, then summary judgment for the appellant would be proper.

■ We have no way of knowing whether, in denying summary judgment, the court had in mind matters we have here discussed. *Guam Federation of Teachers, supra,* had not then been decided and the court did not have before it the language of that case stressing the importance of close judicial scrutiny of the evidence as a buffer against possible First Amendment interferences. We think, on balance, the desirable remand would be one that invites reconsideration of the motion in the light of our views here expressed.[15]

14. It should be noted that while the California Supreme Court has held that the public may have a legitimate interest in the retelling, years after the event, of the story of a crime and the successful prosecution of the criminal, it refused to include within the privileged area as matter of law the identity of the criminal who had successfully rehabilitated himself in the meantime. *Briscoe v. Reader's Digest Association,* 4 Cal.3d at 541–42, 93 Cal.Rptr. at 875, 483 P.2d at 43.

15. However, we have no desire to crowd the district court into making judgment at this stage of the case should it regard the record as inadequate. The case is before us in an unusual context. Denial (as distinguished from grant) of summary judgment involves not only pure questions of law; it involves as well an exercise of discretion upon the question whether decision should be postponed until it can be founded on a more complete factual record.

The order denying summary judgment is vacated and the case is remanded for reconsideration of the motion in the light of the views here expressed.

No costs are allowed to either party.