[No. D005584. Fourth Dist., Div. One. Feb. 26, 1988.]

TIMES-MIRROR COMPANY et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
JANE DOE, Real Party in Interest.

**COUNSEL**

Gibson, Dunn & Crutcher, Rex S. Heinke, Linda L. Berger and Jeffrey S. Klein for Petitioners.

No appearance for Respondent.

Monaghan & Metz, Brian D. Monaghan, Procopio, Cory, Hargreaves & Savitch and David A. Niddrie for Real Party in Interest.

**OPINION**

**WIENER, J.**—The Times-Mirror Company, publisher of the Los Angeles Times (Times), and Amy Rinard Chance (Chance) petition for writs of mandamus, prohibition, and review after the court denied their summary judgment motion. The Times published Jane Doe's (Doe) real name after she discovered her roommate's body and confronted the suspected murderer. We issued an order to show cause. We deny the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

Shortly after midnight on July 13, 1981, Doe returned to her apartment to find the dead, nude body of her roommate, Rose Rende (Rende) lying on the floor. Rende had been raped, beaten and strangled. Doe looked up to confront a man. She then fled the apartment and found a police officer.

Doe provided a description of the man to the police. The police withheld her identity from the public for her protection and to further their investigation. A deputy coroner investigated and prepared a "call memorandum" stating Doe had identified the victim.

Chance, a summer intern at the San Diego office of the Times, heard a radio broadcast concerning Rende's death. Chance says she called the coro-

ner's office and obtained details of Rende's murder from an unknown person. According to Chance, the individual identified Doe by name as the victim's roommate and told her Doe had discovered the body.

Chance went to her editor with her information. She also told him she knew the murder victim, having lived next door to her until shortly before the murder. Chance was assigned to cover the story. She interviewed neighbors and detective Lieutenant John Gregory, who told Chance the roommate had provided a description of the suspected murderer. The detective did not identify Doe by name and he told Chance he did not want the information to appear in the newspaper.

The next morning, the Times published an account of Rende's murder written by Chance. The story identified Doe by name as the discoverer of Rende's body. After several intervening paragraphs, the story also stated that "one witness" gave police a description of a man seen fleeing the apartment. Several other newspapers published stories on the murder including a statement the "roommate" had discovered the body. None of the accounts identified Doe by name.

Doe sued the Times and Chance for invasion of privacy, intentional infliction of emotional distress, and negligent infliction of emotional distress. In 1983 the Times and Chance moved for summary judgment contending the publication of Doe's name was absolutely privileged because the name was a matter of public record having been obtained from the San Diego Coroner's Office. The court denied the motion.

In October 1986 they again moved for summary judgment reasserting their original ground plus raising seven new ones. The court once again denied the motion finding questions of fact. The Times and Chance filed this petition which we denied. Upon direction of the Supreme Court, we issued an order to show cause.

DISCUSSION

I

Doe contends the Times and Chance invaded her privacy by identifying her by name as the discoverer of Rende's body in the story on Rende's murder. The Times[1] contends the trial court erred in denying its summary judgment motion both because under the First Amendment it was privi-

---

[1] All arguments raised are made by the Times and Chance. For convenience sake all reference hereafter to the Times will include Chance unless otherwise indicated.

leged to print that information and because printing Doe's name did not constitute an invasion of privacy.[2]

The Times first contends that because its First Amendment right to disseminate information is mandated by the federal Constitution, it *must* take precedence over Jane Doe's right to privacy. We do not agree.

California courts recognize a common law right to privacy and the conflict between that right and the press's right to disseminate information. (See e.g, *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 534 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1].) The right to privacy and freedom of the press are both "plainly rooted in the traditions and significant concerns of our society." (*Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469, 491 [43 L.Ed.2d 328, 347, 95 S.Ct. 1029].) First Amendment rights and privacy rights must be balanced and the outcome of a case ultimately depends upon its own specific facts. (See *Erznoznik* v. *City of Jacksonville* (1975) 422 U.S. 205, 208-209 [45 L.Ed.2d 125, 130, 95 S.Ct. 2268].)

This case raises the question whether the news media is privileged to print the name of a witness to a crime when doing so could subject that witness to an increased risk of harm. Doe confronted and could identify a suspected murderer. The police, following their regular practice, requested the press not to print that information. The Times did not print that Doe could identify the suspect but did print that she had discovered the body. It is Doe's position that by publishing her name as discoverer of the body, the Times in effect told the suspected murderer the name of the person who confronted him at the murder scene and could identify him. Under the facts of this case the position is not unreasonable.

In her deposition Chance testified she did not know the suspected murderer had seen Doe and had she known she would not have published her name. In other words, she did not know that by printing Doe had discovered the body the suspect would know who had seen him at the scene. However, Chance also testified that she knew Doe had discovered the body from the coroner's office and that she later learned from the investigating

---

[2] The Times additionally raises a procedural issue, arguing the allegations of the Times's petition must be deemed admitted because Doe's response to the order to show cause did not conform to California Rules of Court, rule 56(c) (i.e., the response was in an improper format and was unverified). Doe's memorandum of points and authorities in opposition to petition for writ of mandate was verified by Doe. Additionally, Doe has augmented the record with a verification to the response to the order to show cause signed by Doe's counsel conforming to the requirements of Code of Civil Procedure section 446. We deem the response to be procedurally sufficient and in a form that controverts the disputed facts. (See *Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77, 81, fn. 3 [112 Cal.Rptr. 777, 520 P.2d 1].)

detective Doe had provided the police with a description of the suspect. Chance's testimony raises the question whether she knew or should have found out whether Doe confronted the suspect at the murder scene.

Where a crime victim's safety is involved, at least one case has found that the news media may be subjected to liability for printing the victim's name and address. In *Hyde* v. *City of Columbia* (1982) 637 S.W.2d 251, certiorari denied 459 U.S. 1226 [75 L.Ed.2d 467, 103 S.Ct. 1233] the plaintiff had been abducted by an unknown assailant who was still at large. The defendant published an article about the incident including plaintiff's name and address. Plaintiff sued the newspapers for negligent disclosure of her name and address. The trial court dismissed the action for failure to state a cause of action. The Missouri appellate court reversed stating: "We determine . . . that the name and address of an abduction witness who can identify an assailant still at large before arrest is a matter of such trivial public concern compared with the high probability of risk to the victim by their publication, that a news medium owes a duty in such circumstances to use reasonable care not to give likely occasion for a third party [assailant still at large] to do injury to the plaintiff by the publication. That duty derives . . . from a balance of interests between the public right to know and the individual right to personal security—between the social value of the right the press advances and the social value of the right of the individual at risk." (*Id.* at p. 269.) Balancing these interests the Missouri court concluded that deleting the name and address of the victim would not have impaired any significant news function or public interest in reporting of crimes. (*Id.* at p. 271.)

We conclude that where an individual observes and can identify a suspected murderer who is still at large, the First Amendment provides no absolute protection from liability for printing the witness's name. The individual's safety and the state's interest in conducting a criminal investigation may take precedence over the public's right to know the name of the individual.

## II

The Times contends summary judgment should have been granted because Doe's name was not a private fact. ■ There are three elements to a cause of action for invasion of privacy arising out of the publication of a private fact: (1) The fact must first be private; (2) there must then be a public disclosure of the private fact; and (3) the matter made public must be one the disclosure of which would be offensive and objectionable to a reasonable person of ordinary sensibilities. (*Sipple* v. *Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1045 [201 Cal.Rptr. 665].) ■ The test of

whether to grant summary judgment in free speech cases, as with all cases, is whether there is a triable issue of material fact. (*Id*. at p. 1046.) The burden lies with the Times as moving party to support its motion. (Code Civ. Proc., § 437c.) To prevail therefore, the Times had to demonstrate there was no triable issue of fact whether Doe's name in connection with discovering the body was private.[3]

The Times contends Doe's identity as discoverer of the body was not a private fact both because it was publicly known before the Times published its story and because it was disclosed in connection with an event that took place in the public eye. On the day of the murder, the police issued a press release stating Rende's body had been found by her roommate in their apartment at a particular address. Several newspapers printed stories with that information. Doe testified at her deposition that before the Times's story was printed she told certain friends, neighbors, and family members she discovered the body and confronted the murderer. Additionally, police and members of the coroner's office knew Doe's name and identity as discoverer of the body. Further, Doe waited outside the apartment on the street while police investigated and was later questioned at a neighbor's house and in a public restaurant. Because of these facts the Times contends Doe's connection with the homicide took place in public view and was known by many people.

After issuance of the police press release and publication of related stories, there is no question the fact Rende's "roommate" discovered the body was public knowledge. The crucial question, however, is whether the fact *Jane Doe* discovered the body was public knowledge.

The Times argues because the investigation took place in public anyone could have identified Doe and impliedly ascertained her role in the event. The argument is without merit. Because Doe waited outside the apartment and was questioned by police in a public restaurant, though it may indicate to the observer she was in some way connected with the investigation, certainly does not provide public notice she discovered the body.

The question then is whether Doe by telling certain people she discovered Rende's body rendered her role as discoverer of the body public. Talking to selected individuals does not render private information public. (See *Virgil v. Time, Inc.* (9th Cir. 1975) 527 F.2d 1122, 1127; Rest.2d Torts, § 652D, com. b.) Here the record shows Jane Doe revealed the fact she had discovered Rende's body and confronted the murderer to selected neighbors,

---

[3]The Times argues whether information constitutes a private fact is a question to be decided by the court as a matter of law. The question may only be decided as a matter of law on summary judgment when no triable issue of fact exists.

friends, family members, and officials investigating the murder. On the record before us we cannot say Doe rendered otherwise private information public by cooperating in the criminal investigation and seeking solace from friends and relatives.

The Times contends names by their very nature are public facts. Although names may appear in public records and normally be public information, this does not mean the press can print names in connection with sensitive information with impunity. California courts have held that even where particular facts about an individual can be printed the person's identity may be treated separately and not be subject to publication. (See e.g., *Melvin* v. *Reid* (1931) 112 Cal.App. 285, 291 [297 P. 91].)[4]

### III

The Times contends summary judgment should have been granted because publication of Doe's name was newsworthy. ■ It is well settled that even where the three elements for a cause of action for invasion of privacy are met, publication of the information may still be exempt from liability if it is truthful and newsworthy. (*Sipple, supra,* 154 Cal.App.3d at p. 1046.) To determine whether an incident is newsworthy a court considers the social value of the published facts, the extent of the intrusion into ostensibly private matters, and the extent to which a party voluntarily assumed a position of public notoriety. (*Briscoe, supra,* 4 Cal.3d at p. 541.)

■ The Times argues publication of Jane Doe's name was newsworthy as a matter of law because it was a report on the circumstances of a current crime which is of legitimate public concern. Truthful reports of recent crimes are of public interest and generally protected by the First Amendment. (See *Brisco, supra,* 4 Cal.3d at pp. 535-537.) However, while the general subject matter of a publication may be newsworthy, it does not necessarily follow that all information given in the account is newsworthy. (See *Virgil* v. *Time, Inc., supra,* 527 F.2d at p. 1131.) Whether a publication

---

[4] The Times additionally contends Doe's name could not be a private fact because there was nothing in the nature of the information published nor in the manner in which it was obtained that would warn the news media it was private. That is, whether Chance obtained the name from the coroner's office or from interviewing neighbors, the Times would have no reason to anticipate any liability for publishing the name. Rather than addressing whether Doe's name as discoverer of Rende's body was a private fact this argument really addresses whether the publication of her name was privileged because her name was obtained from the coroner's office or through normal news gathering techniques. These questions are addressed in sections IV and VII, *infra.* As to the nature of the information, the Times argues Doe's name was not a private fact because its publication was not highly offensive. Whether the information published would be offensive and objectionable to a reasonable person is a separate element of the tort of invasion of privacy separate and distinct from whether the information published is private.

is newsworthy depends upon community mores. (*Id.* at p. 1129.) If there is room for differing views whether a publication would be newsworthy the question is one to be determined by the jury and not the court. (*Id.* at 1130; see also *Capra* v. *Thoroughbred Racing Ass'n* (9th Cir. 1986) 787 F.2d 463.)

We therefore look not to whether the publication of an account of Rende's murder was newsworthy but to whether the publication of Doe's name was newsworthy. Applying the three part test to the facts of this case a jury must consider the social value of publishing Doe's name by balancing the value to the public being informed of the name of a person who discovered a murder victim against the effect publication of her name might have upon Doe's safety and emotional well being. The jury must also consider the seriousness of the intrusion and the extent to which Doe voluntarily exposed herself to notoriety. The court correctly concluded those are factual determinations for the jury.

## IV

The Times contends Chance obtained Doe's name from the coroner's office and therefore, the publication of the name was absolutely protected under *Cox Broadcasting Corp., supra,* 420 U.S. at page 496 [43 L.Ed.2d at page 350].

On this record we need not decide the application of *Cox.* The trial court found there was a triable issue of fact on whether Chance obtained Doe's name from the coroner's office. The Times argues Chance's testimony she obtained the information from the coroner's office is uncontroverted. However, while people at the coroner's office talked to reporters about the murder on the morning in question, and may have given out Doe's name, no one at the coroner's office specifically remembers talking to Chance. In providing information to the press, coroner's office personnel obtain their information either from a press release or a call memorandum, both of which are prepared by the deputy coroner handling the investigation. Consistent with this practice, Chance testified her unknown informant at the coroner's office appeared to be reading the information he gave her. However, Deputy Coroner Cogen, who was handling the investigation, testified he did not remember if he prepared a press release but that if he had, he would not have included Doe's name. Also, the call memorandum which Cogen prepared on the morning Chance testified she called the coroner's office does not state Doe discovered the body. Rather it states Doe identified the body and reported "a 'person down and male walking about residence.'"

Doe testified in her deposition that when she asked Chance where she got her name, Chance responded "I knew Rosie." Chance knew the decedent

and had lived in the neighborhood where the murder took place. She interviewed several neighbors. A jury might find, as Doe contends, Chance obtained her name from the neighbors or possibly from Rose herself before her death.

Additionally, Code of Civil Procedure 437c, subdivision (e) authorizes the court to deny summary judgment when there is only one witness to a material fact. Here, Chance is the only witness as to where she obtained her information.

V

The Times next argues that, conceding a factual issue as to the source of Doe's name, summary judgment should have been granted because the coroner was required by statute to investigate Rende's death and to keep a public record including the name and address of witnesses. (Gov. Code, §§ 27491, 27463.5.) Citing *Metter v. Los Angeles Examiner* (1939) 35 Cal.App.2d 304, 311-312 [201 Cal.Rptr. 665], the Times argues Doe can have no privacy interest in the nondisclosure of information that by operation of law cannot remain private. In effect, the Times position is that because Doe's name will eventually become public, early release does not give rise to liability for invasion of privacy.

 Once official records are available for public inspection, there can be no privacy interest in their content. (See *Cox Broadcasting Corp., supra,* 420 U.S. at p. 496 [43 L.Ed.2d at p. 350].) It does not follow, however, that when information is required by law to be released as a public record, its earlier publication cannot result in liability for invasion of privacy.

In *Metter,* plaintiff's wife committed suicide by jumping from the 12th floor of an office building. The newspaper published an account of the suicide. Plaintiff sued asserting a derivative right to privacy. The trial court directed a verdict for the defendant. The Court of Appeal affirmed holding Mrs. Metter's right to privacy was personal and did not survive her death. (*Metter, supra,* 35 Cal.App.2d at pp. 310-311.) The court also held that to the extent her husband had a "relational right" to privacy, the trial court's decision was correct because: (1) the circumstances surrounding Mrs. Metter's death had become an object of the coroner's investigation and a matter of public record (*id.* at pp. 311-312); and (2) Mrs. Metter had waived any right to privacy in her suicide committed in a public and sensational manner. (*Id.* at p. 312.)

The Times relies on *Metter's* statement: "The manner of Mrs. Metter's death imposed upon the coroner the duty of making an official investigation

as to the cause of death, with regard to which all relevant circumstances became the proper subject of official inquiry. The incident described by respondent newspaper had to do with these circumstances, and therefore the publication thereof cannot be held to violate a right of privacy." (*Id.* at pp. 311-312.) However, *Metter* additionally stated that when Mrs. Metter's suicide "became by operation of law the object of an investigation by a public officer *and also became the subject-matter of a public record*" the publication of information on her death could not have violated anyone's right to privacy. (*Id.* at p. 311; italics added.)

The Times's reliance on *Metter* is misplaced. First, Doe is very much alive and her rights to privacy, unlike Mrs. Metter's, are viable. Second, the coroner's report containing Doe's name did not become public until one month after the murder and the court correctly found a question of fact existed on whether the plaintiff's name was part of the public domain before release of the coroner's report. Third, Doe, unlike Mrs. Metter, did not waive her right to privacy by voluntarily doing an act which made her an object of public interest.

## VI

■ The Times next argues that absent a state interest of the highest order the state may not punish a defendant for publishing lawfully obtained truthful information. (*Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97, 103 [61 L.Ed.2d 399, 405, 99 S.Ct. 2667].) In addition to *Smith,* the Times bases its argument on *Cox Broadcasting Corp.* v. *Cohn, supra,* 420 U.S. 469; *Oklahoma Publishing Co.* v. *District Court* (1977) 430 U.S. 308 [51 L.Ed.2d 355, 97 S.Ct. 1045]; *Landmark Communications, Inc.* v. *Virginia* (1978) 435 U.S. 829 [56 L.Ed.2d 1, 98 S.Ct. 1535]; and *Nicholson* v. *McClatchy Newspapers* (1986) 177 Cal.App.3d 509 [223 Cal.Rptr. 58].

*Smith* and *Landmark Communications* both involved the enforcement of criminal statutes and not individual privacy claims. They therefore provide little help in analyzing the issues presented. (See *Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 812 [163 Cal.Rptr. 628, 608 P.2d 716].)

*Cox Broadcasting Co.* involved civil liability for invasion of privacy but held only that a newspaper could not be liable for publishing the name of a rape victim where the information had already been released to the public in official court records. In a similar manner the court in *Oklahoma Publishing* held that a newspaper could not be enjoined from publishing the name of a juvenile offender where the name was obtained at court proceedings open to the public. The Times did not obtain Doe's name in open court proceedings or from public records open to public inspection. However, even assuming

the Times is correct in its position that *Cox* and *Oklahoma Broadcasting Co.* precluded liability for publishing information obtained from a coroner's office, a question of fact exists on whether Chance obtained Doe's name from the coroner's office.

In *Nicholson* the defendants published a story that said the State Bar determined plaintiff was not qualified for judicial appointment. *Nicholson*, while acknowledging the state interest in keeping the Bar's proceedings confidential, emphasized the publication of information on the plaintiff's qualifications lay "near the core of the First Amendment." (*Nicholson, supra,* 177 Cal.App.3d at p. 517.) The state's interest was not sufficient to overcome the defendant's First Amendment rights to publish the information.

Here we are not concerned with publishing information on qualifications of someone seeking judicial office but with publishing the name of a witness to a crime. The state must investigate violent crimes and protect witnesses. Already reluctant witnesses will be more hesitant to provide information if their names will appear in the morning paper. The state's interest is particularly strong when the criminal is still at large. The state's interest is reflected in the regular police policy not to release the identity of witnesses. In accordance with that policy Lieutenant Gregory asked Chance not to divulge Rende's roommate had seen and provided a description of the suspect. The interest of the state to protect witnesses and to conduct criminal investigations is sufficient to overcome the Times's First Amendment right to publish Doe's name.

The Times further argues that even with a compelling state interest the publication would still be protected because any state interest cannot be furthered by punishing the Times when the state itself makes the same information available, i.e., in the coroner's report. Because the state may eventually make information public does not mean its purpose in preventing an earlier publication should not be served. To accept the Times reasoning would put the state in the position where it could never prevent the dissemination of information that it, at some future time, would make public.

## VII

■ The Times next asserts that assuming Chance did not get Doe's name from the coroner's office, its publication was still protected. Even if Chance learned Doe's name because Chance had lived in the neighborhood or through interviewing neighbors, there can be no liability because the information was obtained through routine reporting techniques. The Times cites *Smith* v. *Daily Mail Publishing Co., supra,* 443 U.S. at pages 103-104

[61 L.Ed.2d at p. 405] and *Nicholson* v. *McClatchy Newspapers, supra,* 177 Cal.App.3d at pages 513, 519-520 in support of its argument.

The Times's argument fails because although the press may normally print information gained through normal news gathering techniques, it is the truthful publication of *newsworthy* information that is privileged. (See *Nicholson, supra,* 177 Cal.App.3d at pp. 515, 519-520.) As we have already discussed, whether or not the publication of Doe's name was newsworthy is a question to be answered by the jury.

### VIII

The Times finally asserts Doe failed to show a high probability she would ultimately prevail. The court found at least three issues of triable fact: (1) whether Doe's name was a private fact; (2) whether the witness's name had become public through the coroner's office before its publication; and (3) whether the disclosure of the name was unwarranted (i.e., whether the publication of the name was newsworthy). All are triable issues of fact.

The Times contends *Sipple* requires a plaintiff to show a high probability of ultimate success before summary judgment in a case involving First Amendment rights can be denied. (*Sipple, supra,* 154 Cal.App.3d at pp. 1046-1047.) The court read the parties written points and authorities and held oral argument. The evidence is conflicting. The court could reasonably conclude there was a high probability of success.

We conclude the respondent court did not err in denying summary judgment.[5] Accordingly, the writ is denied.

Kremer, P. J., concurred.

**BUTLER, J.**—I dissent. With all deference to my colleagues, the majority opinion simply does not address the critical issue in this case—the First Amendment immunity to which the Times and Chance are entitled. As I read the record, the facts supporting immunity are not disputed, immunity is established and the Times and Chance are entitled to dismissal of the complaint. The majority discussion of elements of the invasion of privacy tort and its findings of triable issues of fact are irrelevant.

---

[5] It is unnecessary to address whether the plaintiff could maintain independent causes of action for intentional and negligent infliction of emotional distress if summary judgment had been granted on the invasion of privacy cause of action.

## I

The tort of invasion of privacy arising out of the publication of a private fact has these elements—a private fact, a public disclosure of the private fact and the matter so disclosed is offensive and objectionable to a reasonable person of ordinary sensibilities. (*Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 808-809 [163 Cal.Rptr. 628, 608 P.2d 716].) The tort involves First Amendment concerns and the publisher is protected from liability if the published matter is newsworthy and does not reveal factors so offensive as to shock community notions of decency. (*Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 535, 541[93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]; *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35-36 [81 Cal.Rptr. 360 [459 P.2d 912].) The third element of the tort, the matter disclosed is offensive and objectionable to a reasonable person of ordinary sensibilities, equates to the second element of the protective shield—the publication does not reveal facts so offensive as to shock community notions of decency.

## II

I ask the first question bearing on immunity—was the publication newsworthy?

"Newsworthiness" is a shorthand expression describing matters which are of legitimate concern to the public. (*Sipple* v. *Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1048 [201 Cal.Rptr. 665].) *Virgil* v. *Time, Inc.* (9th Cir. 1975) 527 F.2d 1122 looked at California cases: " 'In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, *and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern. . . .' "* (*Id.* at p. 1129, italics added.) While *Briscoe* posits a two-part protective test, newsworthiness *and* a shock to a community's sense of decency, *Virgil* includes in its concept of newsworthiness the notion the matter is offensive to the community as measured by a reasonable member-of-the-public standard akin to that in the third element of the tort itself. (*Ibid.*) Other cases hold the requirement the matter must be newsworthy to defeat the claim of invasion of privacy requires consideration of a variety of factors, including (1) the social value of the facts published, (2) the depth of the publisher's intrusion into ostensibly private affairs, and (3) the extent to which the party voluntarily assumed a position of public notoriety. (*Briscoe* v. *Reader's Digest Assn., supra,* 4 Cal.3d 529, 541; *Kapellas* v. *Kofman, supra,* 1 Cal.3d 20, 36;

*Sipple* v. *Chronicle Publishing Co., supra,* 154 Cal.App.3d 1040, 1048; *Diaz* v. *Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 132 [188 Cal.Rptr. 762]; *Capra* v. *Thoroughbred Racing Ass'n* (9th Cir. 1986) 787 F.2d 463, 464.) These enumerated factors are restatements of *Virgil's* concept of newsworthiness.

No citation of authority is required for the proposition a murder is a newsworthy event as a matter of law. When Doe opened the apartment door, she walked upon a public stage, the scene of Rende's murder. Discoverer of the body, she became a part of a newsworthy event. Restatement Second of Torts, section 652D, comment f, points out: "*Involuntary public figures.* There are other individuals who have not sought publicity or consented to it, but through their own conduct or otherwise have become a legitimate subject of public interest. They have, in other words, become 'news.' Those who commit crime or are accused of it may not only not seek publicity but may make every possible effort to avoid it, but they are nevertheless persons of public interest, concerning whom the public is entitled to be informed. The same is true as to those who are the victims of crime or are so unfortunate as to be present when it is committed, as well as those who are the victims of catastrophes or accidents or are involved in judicial proceedings or other events that attract public attention. These persons are regarded as properly subject to the public interest, and publishers are permitted to satisfy the curiosity of the public as to its heroes, leaders, villains and victims, and those who are closely associated with them. *As in the case of the voluntary public figure, the authorized publicity is not limited to the event that itself arouses the public interest, and to some reasonable extent includes publicity given to facts about the individual that would otherwise be purely private. . . .*" (Italics added.) The sole reference to Doe in the Times's story of the murder, a newsworthy event, is this sentence: "Rende's roommate [Jane Doe] discovered the body at about 12:15 A.M. when she returned to the studio apartment they shared." Section 652D, comment f, of the Restatement Second of Torts, points out the article need not be limited to the murder itself and may include "to some reasonable extent" facts about Doe. The only facts published by the Times were her name and her discovery of the body. The fact of discovery is essential to the article—no body, no murder, no story. Doe's identification in the article which, of course, made no reference to the man whom she saw in the apartment, does not offend the values placed by society upon one's identity. It is true Doe's name was not listed in the telephone directory, tax rolls, city directory or on the apartment door. That nonlisting was a personal preference. While the Times's publication of her name may have been offensive to her, we look to the reaction of the responsible person of ordinary sensibilities. (*Virgil* v. *Time, Inc., supra,* 527 F.2d 122, 129.) Our society requires personal identification to cash a check, drive a car, open a bank account, get married,

license a dog and get a job. Birth certificates tell our names. Death certificates toll our demise. Surely, the publication of Doe's name by the Times without more cannot be offensive and objectionable to that reasonable person of ordinary sensibilities who daily produces identification and whose name is continually retrieved from computer storage. (See *McNutt v. New Mexico State Tribune Company* (1975) 88 N.M. 162 [538 P.2d 804, 84 A.L.R.3d. 1148]; *Strutner v. Dispatch Printing Co.* (1982) 2 Ohio App.3d 377 [442 N.E.2d 129]; Annot., Publication of Address as Well as Name of Person as Invasion of Privacy (1978) 84 A.L.R.3d 1159-1161.)

The conclusion is inescapable. The Times printed an account of the murder, a newsworthy event. Doe as the discoverer of the body became a part of that event. Her identification as the discoverer does not offend social values or constitute an impermissible intrusion into her private life. She, unhappily, became an involuntary public figure. As a matter of law, the publication of Doe's name was newsworthy.

I ask the second question in application of the privilege—was the publication so offensive as to shock community notions of decency? The simple sentence in the Times's article, "Rende's roommate [Jane Doe] discovered the body at about 12:15 A.M. when she returned to the studio apartment they shared," cannot offend community notions of decency. That sentence is the only reference to Doe. The story does not describe her encounter with the shadowed man or suggest she can identify the suspect. A reasonable person of ordinary sensibilities reading the story could draw no inference from the reference to Doe that she was placed in fear the suspect might seek to silence her. A person with those sensibilities could not conclude the publication of Doe's name is offensive or objectionable.

The publication of Doe's name is protected and does not give rise to publisher liability for invasion of privacy as the disclosed matter, as a matter of law, is not so offensive as to shock the community's sense of decency, and is newsworthy. The majority opinion extensively discusses the issue whether Doe's name was a private or a public fact. As the publication is protected, the status of the name, private or public, is irrelevant.

### III

The majority opinion holds offensiveness of the publication and shock to the community sense of decency present triable issues of fact. Doe's declarations in opposition to the motion for summary judgment do not include matters touching upon offensiveness or shock to a sense of decency arising from the publication of her name. She goes beyond the four corners of the news account of the murder into her subjective reactions to the publication

of her name, averring shock, distress, fear, apprehension for her safety, loss of sleep, loss of job and move to another city. Doe fails to present any evidence to set aside the Times's shield of immunity. The majority opinion looks to the subjective reaction of the person who asserts an invasion of privacy by a media defendant to determine the scope of First Amendment guarantees of freedom of the press. The majority opinion thus discards the reaction of the reasonable person of ordinary sensibilities whether the published matter is offensive and objectionable. The reporter and the editor are now hostage to the paranoiac, the psychotic, the schizophrenic, whose reactions to publication now determine the scope of First Amendment media immunity. Should the majority view prevail, I forecast the weather in newsrooms across the state as continued freezing temperatures with chilling effects on First Amendment guarantees of freedom of the press.

## IV

Doe also pleaded causes of action for negligent and intentional infliction of emotional distress. She incorporated in those causes of action the substantive allegations of her invasion of privacy claim. The gravamen of all three causes of action is the publication of her name. Having concluded there are no triable issues of fact with respect to Doe's invasion of privacy cause of action, the Times is entitled to summary judgment on the infliction of emotional distress causes of action as they are based on the same facts. (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d 244, 265.)

## V

I would issue a peremptory writ of mandate directing the trial court to vacate its order denying Chance and the Times's motion for summary judgment and to enter its order granting the motions.

A petition for a rehearing was denied March 25, 1988, and the opinion was modified to read as printed above. Butler, J., was of the opinion that the petition should be granted. Petitioners' application for review by the Supreme Court was denied May 19, 1988. Mosk, J., was of the opinion that the petition should be granted.